**R.E.D.M. CORPORATION**

v.

**The UNITED STATES.**

No. 408–67.

United States Court of Claims.

July 15, 1970.

Pierre J. LaForce, Washington, D. C., for plaintiff. John J. Ross, Washington, D. C., attorney of record. Hogan & Hartson, Washington, D.C., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM.

This case was referred to Trial Commissioner George Willi with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on February 24, 1970, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion, plaintiff urged its adoption and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, as to the claim under the first contract (No. DA 30–069–ORD–3063), plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied with further proceedings stayed pursuant to Rule 167 for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution of the amount of equitable adjustment to which plaintiff is entitled. Further, as to the claim under the second contract (No. DA 30–069–ORD–3416), plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and the petition is dismissed.

## OPINION OF COMMISSIONER

WILLI, Commissioner: Plaintiff sues here to reverse the Armed Services Board of Contract Appeals' denial of its claim for an equitable adjustment under each of two consecutive [1] Army contracts for the manufacture of artillery fuzes used to ignite the explosive charge in anti-tank projectiles. The two contracts contained identical drawings and specifications and were otherwise the same in all respects relevant here.

Though plaintiff's theory of recovery is based on the contention that defective specifications and drawings caused it extra expense in performing the contracts,

[1]. The first contract, for 320,000 fuzes, was entered into on May 24, 1960, and the second, for 150,200 additional fuzes, on June 28, 1961.

it proceeds here, as it did before the Board, on the premise that its grievance is fully redressable under the standard Changes clause of the contracts. See L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 1290, 186 Ct.Cl. 499, 507–508 (1969), and cases cited. There being no dispute as to the availability of complete relief under the contract,[2] the review here is limited to the issue of liability[3] and accords all relevant Board factual determinations the finality imparted by the standard Disputes clause of the contracts, since it is found, and not really contested by the parties, that such determinations pass muster under the standards of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. § 321 (1964). Thus, to the extent that the Board is reversed here, it is not because of a rejection of its view of the facts but a difference of opinion as to the legal consequences that flow from them.

Plaintiff's first contract (No. DA 30–069–ORD–3063), entered into May 24, 1960, called for production of 320,000 M509E6 fuzes at a fixed price. The fuze consisted principally of a rotor, detonator, and release mechanism. In order for the fuze to arm, the rotor had to so rotate that the detonator contained within the rotor cavity was positioned to ignite two booster charges which, in turn, set off the main explosive charge of the projectile. Movement of the rotor was controlled by an attached rotor pin which was restrained by a release mechanism consisting of three aluminum leaves, stacked one atop another, positioned between two bearing plates. The release mechanism was constructed so that the bottom leaf (Leaf No. 3) could not rotate until the middle leaf (Leaf No. 2) had rotated, and the middle leaf could not rotate until the top leaf (Leaf No. 1) had rotated. Leaf No. 1 was held in position by a leaf spring. When sufficient centrifugal force was exerted to overcome the restraining force of the leaf spring, Leaf No. 1 would rotate, thereby releasing Leaves No. 2 and No. 3 to rotate also. This movement of the leaves removed the restraint on the rotor pin, allowing the rotor to turn approximately 90 degrees into the armed position.

To function acceptably, the fuze had to arm before the projectile reached the target, but not until after the round had been fired. Thus, the contract specified that the fuze must not arm when a centrifugal force up to 2,500 G's was applied. Each fuze produced had to be tested to ensure compliance with this "non-arming" requirement. Further, the contract required that the fuze arm when subjected to a centrifugal acceleration of 4,000 G's. Testing of this "arming" requirement was to be conducted on a sample basis only, with an acceptable quality level ("AQL") of 0.10 percent required.

Plaintiff experienced no difficulties with the non-arming test, but almost immediately encountered problems in meeting the arming requirement. As early as the initial stage of production in August 1960, it was unable to obtain consistent results on in-plant centrifuging tests established to check the arming capability of the fuzes manufactured. Fuzes would sometimes arm within a given G range and sometimes not. When the first pilot lot failed ballistic firing tests in September 1960, plaintiff began conducting the in-plant testing at levels more stringent (initially 3700 G's and eventually 3500 G's) than the contract required, in an effort to ensure that the fuzes would meet the arming requirement for the AQL specified. Twice in conducting the arming tests, plaintiff screened the units on a 100-percent basis. Nevertheless, the number of failures remained excessive. The rejection rate ranged from 10 to 30 percent, with an average of 18 to 20 percent of the assemblies tested failing to meet the arming requirement. Moreover, production costs began to mount.

---

2. Cf. Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963).

3. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

During the remainder of 1960 and the first 10 months of 1961, plaintiff took numerous steps in an effort to isolate the cause of the arming problem. A production check was made to ensure that the fuze was being assembled properly. The leaf spring was adjusted to a tighter arming range and, at one point, removed entirely. An alternate method of assembly, utilizing loose rather than rigid leaf pins, was tried. Tests were conducted to ascertain whether the anti-reset spring was causing Leaf No. 3 to bind. The shape of Leaf No. 3 was modified to determine if the leaf was preventing the rotor pin from revolving. None of these measures suggested a solution and the rejection rate remained high. In February 1961, plaintiff requested that the arming test requirement be raised from a maximum 4,000 G's to 4,300 G's. Although the request was approved in March, the arming difficulties continued.

Sometime during the spring of 1961, plaintiff conducted a centrifuge test of the release mechanism without the rotor and rotor spring, and for the first time fewer rejects were encountered. A similar reduction was noted when the screws holding down the front bearing plate of the release mechanism were loosened. These results led plaintiff, in October 1961, to insert spacers in fuzes which had failed to arm properly. With the spacers inserted, the previously defective fuzes passed the arming test. When the spacers were removed, the fuzes again failed.

These investigations convinced plaintiff that additional clearance was required between the two bearing plates of the release mechanism. Since the contract did not permit the use of spacers, plaintiff decided to obtain extra clearance space by reducing the thickness of the leaves. The contract drawings allowed four-thousandths of an inch tolerance (".0528–.004," i. e., from .0528 inch to .0488 inch) for thickness of the leaves.

When plaintiff bought the leaves needed to make the fuzes, it selected leaves made from metal of a standard thickness, albeit within the range specified by the drawings. The standard thickness was .0510 to .0526 inch—the high side of the permissible range. To gain the additional clearance that it desired, plaintiff ordered new leaves that were custom-milled two-thousandths of an inch thinner than those that it bought originally. This resulted in a leaf that was on the lower end (approximately .0490 to .0508 inch) of the thickness range authorized by the drawings. When the thinner leaves were used, commencing in late October 1961, the rejection rate dropped drastically. From the previous level averaging almost 20 percent rejects, the rate was reduced to one-half of 1 percent to 3 percent.

On June 28, 1961, approximately 4 months before a solution to the arming problem was reached, plaintiff and defendant entered into a follow-on contract (No. DA 30–069–ORD–3416) for an additional 150,200 M509E6 fuzes, again at a fixed price. Production of fuzes under this contract was governed by contract specifications and drawings which, as earlier noted, may be treated the same as those governing production under the first contract. In the initial stages of production under the follow-on contract, plaintiff again experienced arming failures, just as it had under the first contract. As a result of these difficulties, it alleges that extra costs were also incurred.

By letter to the contracting officer dated April 24, 1963, plaintiff requested an equitable adjustment for both contracts, alleging that the additional costs resulted from inadequate contract specifications and drawings. Plaintiff's claims were denied by the contracting officer and a timely appeal was taken to the Armed Services Board of Contract Appeals.

In both its original decision of February 18, 1966 and its decision of June 21, 1966, on plaintiff's motion for reconsideration, the Board denied plaintiff's claims under each of its contracts for extra costs resulting from allegedly de-

fective specifications, even though it found that (1) most, if not all, of the assemblies in question were manufactured within the allowable tolerances, (2) a substantial percentage of the units manufactured within permitted tolerances nonetheless failed to arm properly, and (3) after plaintiff began using thinner leaves, arming failures dropped to well within the performance requirements of the contract.

In withholding relief despite these cogent factual considerations, the Board reasoned that because plaintiff's proof had failed to show why the thicker leaves which it used originally caused arming failure in only 20 percent of the fuzes rather than all of them, the drawings specifying a tolerance range including that thickness could not be deemed defective for liability purposes. Additionally, the Board declared that even if the dimensional data specified on the drawings were regarded as actionably erroneous, plaintiff could not reasonably have relied on them because the same drawings included various narrative references to the fact that in order to be acceptable under the contract, a fuze had to pass the arming test. This admonition, the Board seemed to feel, somehow overrode the significance of the details specified in the drawings.

As to plaintiff's follow-on contract, the Board denied relief for the further reason that in June of 1961 when plaintiff entered into that contract, it already knew from its own experience that a serious, and as yet unsolved, arming problem existed. Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 779, 160 Ct.Cl. 437, 445 (1963).

For the reasons that follow, it is held that the Board correctly decided the claim under the second contract but erred as a matter of law in denying an equitable adjustment under the first.

■ In light of the singularly contrary purport of all of its factual determinations relevant to the problem of arming, it was plain error for the Board to refuse to acknowledge, simply because plaintiff experienced less than total arm-

ing test failure, that the contract drawings were defective in expressly authorizing too broad a range of leaf metal thickness to insure proper arming of the completed fuze assemblies.

The fact that tolerance specifications yield some acceptable finished articles clearly does not mean that they may not be deemed defective for purposes of the author's liability to the user. In Ithaca Gun Co. v. United States, 176 Ct.Cl. 437, 440 (1966), the court did not hesitate to declare tolerance specifications for machine gun subassemblies defective even though some of the components that were manufactured ·according to those specifications fit together satisfactorily. In awarding the manufacturer reimbursement of additional costs incurred in attempting to achieve satisfactory results by following the Government's original specifications, the court expressed the liability standard applicable to tolerance specifications included in Government contracts as follows (at page 443):

> * * * Unless some reason therefor is indicated, contractors normally are not required, prior to bidding, to undertake an expensive and time-consuming "tolerance check" with respect to every possible permitted dimension of every component simply to verify the accuracy of the Government's drawings and their suitability for the production of a properly functioning end item. Contractors are ordinarily entitled to assume that parts manufactured in compliance with the prescribed dimensions and permitted tolerances, even the extremes thereof, will, when joined, properly function. * * *

Here the evidence established, and the Board found, (1) that most, if not all, of the assemblies were manufactured within allowable tolerances; (2) that, nonetheless, an average of 20 percent of the units failed the arming test; (3) that plaintiff took numerous steps to isolate the cause of the problem; (4) that when thinner leaves were used in the release mechanism the rejection rate dropped

markedly to an acceptable level; and (5) that use of thinner leaves was the only action which had an appreciable effect on the number of failures. Moreover, there was no suggestion from the evidence that plaintiff was guilty of any faulty workmanship or defective manufacturing practices that might have accounted for the intolerable rate of arming test failure uniformly experienced prior to the reduction of leaf metal thickness. In fact, the proof revealed that a check to ensure that proper production procedures were being employed was among the first steps taken by plaintiff in an effort to identify the cause of the arming problem.

To deny plaintiff recovery of its provable extra costs in these circumstances because it was unable to explain to the Board's satisfaction why reducing leaf thickness substantially eliminated arming test failure, would be altogether unrealistic and wholly unwarranted.

Plaintiff's predominant concern was with the practical problem of eliminating the average 20-percent rejection rate that it was experiencing on fuze assemblies manufactured in accordance with the plans and specifications of the contract. After an extended period of trial and error in which all else failed, reduction of leaf thickness effectively and permanently solved the problem. The fact of solution, rather than its rationale in terms of engineering theory, was understandably of paramount interest to the plaintiff. It had not contracted to furnish the Government with an analytical study of the conceptual efficacy of the plans by which it was told to build the fuzes. While an explanation as to why the decrease in leaf thickness assured reliability in arming would have been academically desirable, it cannot be made a prerequisite to plaintiff's recovery of the additional costs that it incurred prior to discovering the solution to the dilemma created by the Government's plans.

■ Once it is recognized, as it must be on the Board record and decision under review, that the contract plans detailing the configuration and permissible dimensions of the fuze leaves were defective, it will not do to say, as the Board did, that in any event the plaintiff was not entitled to rely on the dimensional data reflected thereon because those same drawings made reference to the fact that the completed assemblies would have to pass the arming tests prescribed by the specifications.

Specifically, the Board said that the drawing notations [4] "might have" indicated to plaintiff that "leaf-plate tolerances had been set at such level that full utilization of the range of tolerances might lead to arming failures, and hence, that appellant might have to do some experimentation within the tolerance ranges to achieve consistent arming results." [66–1 BCA ¶ 5376, at p. 25, 235]

Here the specifications and drawings prescribed the exact dimensions to be used in producing the release mechanisms, including the range of permissible variation within precisely stated limits. Each leaf was to be .0528 inch thick, within a tolerance of minus .0040 inch. The distance between the bearing plates was fixed at .1680 minus .0070 inch, leaving a total clearance between the leaves and the bearing plates of .0216 inch to .0026 inch. In like fashion, a series of 31 drawings set forth precise dimensions and tolerances for each part of

---

4. Specifically, the Board called attention to:
   (a) advisory note 7 on the leaf spring drawing (No. 8799781) stating that the spring moment (i. e., tension) should be adjusted "to meet the arming requirements of release mechanism";
   (b) advisory note 5 on the release mechanism assembly drawing (No.

8799777) stating that an optional shim could be used "provided arming and non-arming requirements of spec. are met"; and
   (c) notes on "several other drawings, including leaf drawing," specifying that the arming and non-arming requirements of the specifications must be met.

the release mechanism and diagrammed the method of fuze assembly.

Manifestly, these were so-called "design" drawings and specifications by which the contractor was given detailed instructions respecting the fabrication of each of the many components of the total fuze assembly. The mere addition of a brief narrative admonition that the completed article had to arm properly did not transform the fundamental character of the drawings and specifications into the so-called "performance" type, under which the contractor is simply told to achieve a given result and essentially left to his own devices as to how to do so. J. L. Simmons Co. v. United States, 412 F.2d 1360, 1362, 188 Ct.Cl. 684, 689 (1969). Surely it is generally understood that the Government does not advertently buy mechanical devices that do not work. The mere expression on a drawing of what is implicit does not deny the contractor the right to assume that if he follows the detailed instructions given him, a satisfactory product will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L. Ed. 166 (1918).

■ Finally, defendant's suggestion that since plaintiff retained the services of the inventor of the fuze prototype it knew better than to rely on the efficacy of the plans and specifications, is also without merit. This man was not retained until after the arming problem arose, several months after the parties entered into the contract and, thus, had no bearing on plaintiff's knowledge at the time of bidding. See J. D. Hedin

Constr. Co. v. United States, 347 F.2d 235, 241, 171 Ct.Cl. 70, 77 (1965).*

■ Although, for the reasons given, plaintiff is entitled to reimbursement of the extra costs incurred in attempting to perform under the first contract by using the erroneous leaf thickness data that it contained, it is not entitled to a similar adjustment under the follow-on contract. At the time it entered into that contract in late June 1961, it could no longer reasonably assume that the specifications and drawings were adequate. By then it had been experiencing serious difficulties in meeting the arming requirement for nearly 10 months. Although it had not yet determined the cause of the failures, "all the problems were looming large, at least in plaintiff's view," when it signed the second contract. Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 679, 182 Ct.Cl. 507, 531 (1968). In fact, plaintiff's vice president admitted at the hearing that he knew an arming problem existed at the time. Under these circumstances, the Board's denial of the second claim was proper. Helene Curtis Industries, Inc. v. United States, 312 F. 2d 774, 779, 160 Ct.Cl. 437, 445 (1963).

### CONCLUSION

Plaintiff's motion for summary judgment is granted as to the claim under the first contract (No. DA 30–069– ORD–3063); defendant's cross-motion for summary judgment is denied as to such claim; and further proceedings are stayed pursuant to Rule 167 for a period of 90 days to afford the parties an op-

---

* Defendant places great stress on the fact that, although plaintiff was aware by the end of 1961 that the thickness of the leaves was the critical factor in the high rejection rate, no formal claim was presented to the contracting officer until the spring of 1963. Insofar as the argument is that the delay shows that plaintiff did not attribute the difficulty to defective specifications and therefore that the specifications were not defective, the point is meritless. There are any number of reasons for delay in filing formal claims and in any event the proved facts show con-

clusively that the trouble was in fact due to the misleading character of the specifications. Insofar as the defendant's argument is that, if the claim had been presented earlier, the defendant would have been able to discover the true cause of the trouble, there is no factual predicate for the argument, either in the Board's findings, in the evidence now of record, or in any adequate proffer by defendant that it has evidence to that effect. Moreover, defendant does not ask us to remand to the Board to canvass that issue. [Footnote by the court]

portunity to obtain an administrative resolution of the amount of equitable adjustment to which plaintiff is entitled. Further, plaintiff's motion for summary judgment is denied as to the claim under the second contract (No. DA 30–069–ORD–3416); defendant's cross-motion for summary judgment is granted as to such claim, and the petition is dismissed as to that claim.