**SWITLIK PARACHUTE COMPANY, INC.**

v.

**The UNITED STATES.**

No. 386–75.

United States Court of Claims.

April 19, 1978.

---

Ruth E. Ganister, Philadelphia, Pa., for plaintiff; Theodore M. Kostos, Philadelphia, Pa., attorney of record; Stassen, Kostos & Mason, Philadelphia, Pa., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision of Trial Judge Lloyd Fletcher, filed March 8, 1977, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment having been submitted on oral argument by plaintiff's attorney and the briefs of the parties. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff is not entitled to recover and its petition is dismissed.

### OPINION OF TRIAL JUDGE

FLETCHER, *Trial Judge:* This contract dispute involves an appeal by plaintiff, Switlik Parachute Company, Inc., from a decision of the Armed Services Board of Contract Appeals, ASBCA No 18476, dated June 25, 1975. The Board held that plaintiff was not entitled to have a default termination by the Government converted into a termination for convenience of the Government. By cross-motions for summary judgment, the parties have asked the court to review the Board's decision in accordance with the well-known standards of the Wunderlich Act, 41 U.S.C. §§ 321–22.

The factual basis of this appeal is not unusually complicated. On October 27, 1973, plaintiff was awarded a fixed price contract (DSA 100–73–C–0583) for 3,440 nylon survival vests, Type SV2A, by the Defense Personnel Support Center (DPSC), Philadelphia, Pennsylvania, for a total price of $98,900. Under the terms of this contract, the first delivery of 1,020 vests was due during the 30-day period before May

10, 1973, the second delivery of 1,400 vests was due during the 30-day period ending June 9, 1973, and the final delivery of 1,020 vests was due during the 30-day period ending July 9, 1973. Delivery of the vests was to be FOB destination. Points of delivery were at various locations in Pennsylvania, Georgia, Tennessee, Virginia, Utah, and California. On three previous contracts for supply of essentially the same vest, plaintiff had satisfactorily performed.

The contract required plaintiff to submit one finished article to DPSC for approval within 105 days from the award of the contract. Plaintiff complied by submitting a first article on February 9, 1973. Defendant approved conditionally the first article by letter dated February 22, 1973. One of the matters requiring correction was the location of the clinch plates and sockets of the pistol holster closing straps, D4–6 and D4–7 which the Government stated were improperly located pursuant to the drawing requirements of Revision B.[1]

Subsequently, in a letter dated March 27, 1973, plaintiff sought approval from defendant's administrative contracting officer (ACO) of a change in the shade of material used in the pistol holster assembly portion of the vest because its supplier was unable to provide the shade specified in the contract. In a letter dated April 10, 1973, the defendant's procurement contracting officer (PCO) timely approved the requested change.

On April 16, 1973, the ACO sent a letter to plaintiff, complaining that it was not complying with the delivery performance schedule of the contract and that the delinquency did not appear to be based on excusable cause. This letter was prompted by the apparent fact that plaintiff had not proceeded with sufficient speed on the production part of the contract to enable it to meet the delivery schedule. While indicating the possibility of a revised delivery

---

* The dissenting opinion of Judge Nichols follows the opinion of the trial judge which has been adopted by the court.

1. Revision B represented a slight dimensional change in the holster strap assembly from the drawings therefor under previous contracts satisfactorily performed by plaintiff. In essence, the change made the D4–7 strap shorter.

schedule in return for adequate consideration, the letter warned that defendant was not thereby modifying or waiving any of its rights under the contract.

By letter dated April 25, 1973, plaintiff advised the ACO that it had encountered problems in obtaining [2] the correct shade of material required for the pistol holster, but that approval had been obtained from the PCO for a change in the shade. It also informed the ACO that its current anticipated delivery schedule was 1,020 units to be shipped prior to June 15, 1973, 1,100 units to be shipped prior to July 27, 1973, and 1,320 units to be shipped prior to August 31, 1973. It then offered a $50 reduction in the total contract price to compensate for the delivery changes plaintiff had thus stated. By letter dated May 1, 1973, the ACO rejected plaintiff's $50 offer and counter-proposed that "a reduction in the contract price in the amount of $1,700 would be considered adequate consideration" for acceptance of plaintiff's proposed revised delivery schedule. Plaintiff gave no indication of acceptance of the counter offer.

By May 3, 1973, plaintiff had completed approximately 85–90 percent of the items for the first increment of delivery, i. e., 1,020 vests. The remaining 10–15 percent of the work consisted of finalizing the holster pocket assembly, attaching it, putting the two halves together and submitting the final product for inspection. To complete the remaining 10–15 percent of the work would have required approximately two to three days.

At that point in production, plaintiff experienced what he claimed was an impossibility to close the D4–7 holster strap over a pistol gage (or sample) inserted into the holster assembly, as required by the contract's performance specifications, when the D4–7 strap was constructed in accordance with the contract's strict design specifications. Plaintiff continued producing the basic vest but on Thursday, May 3, 1973, it suspended production of the holster assembly because it was concerned that in follow-ing the design specifications, it was producing defective vests which would not meet the contract's actual performance specifications requiring closure of the D4–7 strap over the pistol sample.

At the same time it suspended production of the holster assembly on May 3, 1973, plaintiff notified the ACO of its action by telegram, reading in part:

. . . [M]anufacturing parts in strict accordance with referenced drawing and paragraph E of letter. Impossible to make unit operable! Require technical assistance. All production halted. Please advise.

The ACO forwarded this telegram to the PCO by letter. In response, on Monday, May 7, 1973, the PCO dispatched a quality assurance specialist (QAS) to plaintiff's plant. The QAS handcarried and delivered to plaintiff a letter dated May 7, 1973, in which the PCO advised plaintiff that the QAS's inspection visit was not to be construed as a waiver of the contract delivery schedule, which was reiterated in the body of the letter.

On arrival, the QAS examined a partially assembled vest and found that the D4–7 strap did, in fact, close when snapped shut, but found that closure was difficult due partially, at least, to incorrect vertical stay stitching at the bottom of the holster. He advised plaintiff that he thought a tight fit was desired. To give plaintiff the benefit of the doubt, however, he advised plaintiff he would check with his superiors.

On May 8, 1973, the QAS reported to his supervisor. After close examination of the holster assembly, the QAS and his supervisor agreed that the drawing was technically adequate and that there was nothing to prevent plaintiff from complying with the design specifications. They informed the PCO of that fact around noon the same day.

The PCO claimed that he then notified plaintiff by phone of the specifications' complete adequacy around 2:00 p. m. on

---

2. The material was received on April 26, 1973.

May 8, 1973. The plaintiff countered that no such telephone call was ever received.[3]

On May 10, 1973, plaintiff failed to make delivery of the first increment. The next day the PCO sent a telegram to plaintiff advising him that he was terminating the contract for default for failure to adhere to the delivery schedule. Unfortunately, the telegram was misaddressed, and plaintiff did not receive it until May 18, 1973.[4] On May 19, 1973 plaintiff received a registered, return receipt letter of termination from the Government. This letter was dated May 11, 1973, but was not mailed until May 18, 1973.

In an attempt to have this termination for default converted into one for convenience of the Government, plaintiff appealed the PCO's default termination to the Armed Services Board of Contract Appeals as provided for in the contract's Disputes Clause. The Board concluded, *inter alia*,[5] that plaintiff's failure to deliver the first increment on May 10, 1973, constituted a default because (1) defendant had never waived the delivery schedule and (2) plaintiff had shown no acceptable grounds for excusing its failure to make delivery on that date. On appeal to this court, plaintiff contends that the Board's decision was based on erroneous findings of fact and conclusions of law, and asserts that the default termination was invalid and should be converted to a termination for conve-

nience of the Government. Upon consideration of the parties' briefs, and oral argument, I have concluded that the Board's findings and decision are correct and must be sustained here.

Before the Board's findings can be reviewed, it is important to articulate the legal basis on which the defendant grounds the correctness of its actions as compared to that on which plaintiff seeks to have defendant's actions overturned. The legal basis for defendant's actions is grounded on the contract's Default Clause, paragraph 11(a) of the General Provisions. It provides:

> The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:
>
> (i) If the Contractor *fails to make delivery of the supplies* or to perform the services *within the time specified herein* or any extension thereof. [Emphasis supplied.]

On the other hand, the legal basis on which plaintiff apparently seeks to have the defendant's action under ¶ 11(a) overturned and converted into a termination for convenience is ¶ 11(e).[6] It provides:

> If, after notice of termination of this contract under the provisions of this

---

**3.** In rendering its decision, the Board found it unnecessary to resolve this conflict in testimony and it appears unnecessary to do so here, even were it permissible.

**4.** Between the sending and receipt of the telegram, plaintiff continued production of vests except for the holster assembly. Also, on May 15, 1973, plaintiff responded to defendant's May 1, 1973, letter by raising its offer of consideration from $50 to $200 for a revised delivery schedule while at the same time pointing out that it had not received an answer to the allegation of a discrepancy between the design and performance specifications.

**5.** The Board also found:

(a) That the contract award was mailed on October 27, 1972, and as a result the delivery date for the first increment of survival vests as agreed to in the original contract was May 10, 1973.

(b) That the defendant approved plaintiff's request for a change in the shade of material used in the pistol holster within the period allowed in the contract and therefore plaintiff was not entitled to an extension of the delivery schedule for the period of time it took the defendant to authorize such change.

(c) Plaintiff was not entitled to an extension of the delivery schedule for the period it had to delay production while awaiting the approved shade of material from its supplier. On appeal, plaintiff has not taken issue with these conclusions.

**6.** Although counsel for plaintiff in their briefs do not specifically refer to this contractual provision, it is assumed that ¶ 11(e) must be the provision upon which they rely.

The contract at issue includes, by reference, a standard termination for convenience clause.

clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

From the language of 11(e) it follows that in order to obtain a conversion to a termination for convenience, plaintiff must show either that he "was not in default" in failing to make delivery of the first increment on May 10, 1973, or, if he were in default, that it was "excusable *under the provisions of this clause.*"

In thus stating the underlying legal basis for plaintiff's appeal, the Board's findings are understandable. In finding that there had been no waiver of the delivery schedule, of course, the Board in essence found that plaintiff was in default. By finding that there were no grounds excusing plaintiff's failure to make the required delivery on May 10, 1973, the Board in essence found that the default was not "excusable under the provisions of this clause."

With the Board's findings in mind, it is now possible for this court to determine whether they are supported by substantial evidence and are based on correct conclusions of law within the meaning of 41 U.S.C. §§ 321–22.

 Plaintiff contends that, contrary to the Board's finding, the uncontroverted facts show that defendant did in fact waive the delivery schedule. The rationale of this argument is based on the fact that on May 1, 1973, defendant offered to extend the delivery schedule for an acceptable reduction in the contract price. This offer, along with plaintiff's known continued performance and its alleged duty promptly to reply to plaintiff's request for clarification of specifications, constituted in plaintiff's view

an implied promise not to hold plaintiff to the original delivery schedule. Plaintiff asserts that it reasonably relied on this implied promise by remaining in production past May 10, 1973, until May 18, 1973, the date it received the formal termination notice. As a result, the argument goes, the Government should be estopped from claiming that May 10, 1973, was the delivery date for purposes of issuing a default termination.

Plaintiff's argument, as stated, appears to set forth a theory of an estoppel type of waiver. The Board, however, correctly found to the contrary, and held that no waiver took place because plaintiff "knew or should have known from the Government letters, that the Government had not agreed to extend the delivery schedule (although in response to appellant's offer it had made a counter offer on May 1, 1973, which appellant never accepted) and was in the process of deciding whether to terminate for default." *See* Restatement of Contracts, § 308 (1938).

The Board's findings in this respect are fully supported by the record. Contrary to plaintiff's allegations, the only evidence in the record of defendant's apparent willingness to extend the delivery schedule came in its May 1, 1973, letter, in which any such extension was expressly conditioned on plaintiff's acceptance of a $1,700 reduction in the contract price. This offer, however, was qualified by defendant's May 7, 1973, letter in which defendant reiterated the original delivery schedule. The message contained therein made it quite clear by implication, at least, that the May 1, 1973, extension offer would lapse unless accepted unconditionally before May 10, 1973. By failing to accept defendant's offer before that date,[7] plaintiff relinquished the one opportunity it had to obtain an extension. Therefore, its failure to deliver the first increment of vests on May 10, 1973, placed plaintiff in default, and defendant was ful-

7. Indeed, plaintiff at no time made any effort whatever to accept defendant's offer. It even made a counteroffer (thus, under hornbook

law, rejecting defendant's offer) *after* the delivery date had passed.

ly justified in issuing a termination for default pursuant to ¶ 11(a), *supra*.[8]

■ Finally, in this connection, it is noted that plaintiff does not seem to seriously argue that by the mere failure to notify it of a default termination until May 18, 1973, defendant thereby waived its right to terminate plaintiff for failure to make timely delivery. *See Pelliccia v. United States*, 290–91, 525 F.2d 1035, 1042–43, 208 Ct.Cl. 278 (1975). Even assuming that plaintiff intends to make such an argument, the circumstances justifying a conclusion of waiver simply do not exist. The mere fact that it took eight days (part of which was attributable to a misaddressed notice) to notify plaintiff of the default termination is not sufficient to establish a waiver. There must also be evidence that the defendant manifested an intention not to terminate for failure to make timely delivery upon which manifestation plaintiff relied in continuing production. *See* Restatement of Contracts, § 310 (1938). The only evidence plaintiff points to as indicating such an intention was the presence of a quality assurance representative, who knew that some production was continuing in the plant between May 10–18, 1973. His mere presence, however, cannot be construed as manifesting defendant's interest in continued production under this contract because his presence there was necessitated by plaintiff's performance of other contracts for which he was also responsible. *Cf., Standard Electronics Corp.*, ASBCA Nos. 14753 and 16299, 73–2 BCA ¶ 10,137 at p. 47,670–71. Therefore given the absence of any encouragement by defendant, an eight-day delay was not unreasonable and cannot be construed as a waiver. *Cf., DeVito v. United States*, 413 F.2d 1147, 188 Ct.Cl. 979 (1969) where the delay period consumed some 48 days during which time the contractor was totally unaware that default termination against it was being considered. Under such extreme circumstances, it is hardly surprising that a waiver was held to have occurred. Nothing in the present case bears even a remote resemblance to the *DeVito* facts.

■ Plaintiff also contends that, contrary to the Board's findings, its failure to make delivery by May 10, 1973, was excusable under the circumstances of this case. Before a determination can be made whether it was, the court must first decide what makes something "excusable" under the provisions of ¶ 11(e). Unfortunately, ¶ 11(e) is not self-defining. Reference must therefore be made to another subsection of the default clause. The only subsection which deals with excusability is subsection (c) which provides that the contractor shall not be liable for any excess costs "if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor." From this clause it is a logical step to conclude that the words of ¶ 11(e), "excusable under the provision of this clause," mean excusable only if the contractor shows that his failure to make timely delivery arose out of causes "beyond the control and without the fault or negligence of the contractor." *See Davis v. United States*, 180 Ct.Cl. 20, 34 (1967); and *H & H Manufacturing Co. v. United States*, 168 Ct.Cl. 873, 880–81 (1964). Thus, implicit in ¶ 11(e)'s test is the notion that a contractor has the burden of proving that something outside his control and not due to his fault or negligence kept him from making timely delivery. *See, e. g., Woodside Screw Machine Co.*, ASBCA No. 6936, 1962 BCA ¶ 3308; and *Racon Electric Co.*, ASBCA No. 8020, 1962 BCA ¶ 3528.

■ Applying that rule to the present case, plaintiff has the burden of showing that something outside its control and not

---

8. The factual background underlying this conclusion disposes of plaintiff's contention that defendant's decision to terminate was in any way arbitrary and capricious.

due to its fault or negligence forced it to suspend end-item production from May 3, 1973, to May 8, 1973,[9] if it is to attack successfully the Board's finding [10] as to the true cause of plaintiff's failure to make timely delivery. In the Board hearing, plaintiff failed completely to meet that burden. Although it did introduce some evidence which it contended proved that it was impossible to close the D4–7 holster strap over the pistol gage, as required by defendant's normal design specifications, that evidence was offset by countervailing proof presented by the Government and accepted by the Board.[11] It is, of course, well settled that where the Board has elected to accept one party's evidence as more persuasive than the other's, its determination of such a factual issue cannot be upset by the court since it is not permissible for the court to weigh the evidence independently to determine where the preponderance lies. *Chaney & James Construction Co. v. United States*, 421 F.2d 728, 741–42, 190 Ct.Cl. 699, 724 (1970). Thus, plaintiff has failed to prove that something outside its control had

forced it to suspend end-item production from May 3 to May 8, 1973.

■ Even if it be assumed that defendant's design specifications were deficient, plaintiff in notifying the defendant on May 3, 1973 of the alleged design deficiencies, had discharged its duty not to knowingly produce defective items without first contacting defendant. *See Blount Brothers Construction Co. v. United States*, 346 F.2d 962, 972–73, 171 Ct.Cl. 478, 495–97 (1965). Thereafter, given the absence of either an order by defendant immediately to suspend production or of a change order modifying the design specifications, it was plaintiff's right [12] to go forward with production, even though in so doing defendant might incur liability for defective products. After all, it is the defendant who warrants that compliance with its design specifications will result in an acceptable product. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). *See*, also, *R.E.D.M. Corp. v. United States*, 428 F.2d 1304, 1309–10, 192 Ct.Cl. 891, 901–02 (1970).

9. This was the earliest date on which the defendant can say it responded to plaintiff's request for clarification of the D4–7 design specifications.

10. "However, appellant contends that if its request for clarification had been promptly answered by the Government, it could have met the May 10, 1973, delivery date. If we assume that appellant was notified at the earliest possible date, which would have been the afternoon of May 8, 1973, appellant's contention that it could have met the May 10, 1973, delivery date is not supported by its own testimony. The production manager said that approximately two or three days would have been required to finalize the remaining 10–15 percent of the unfinished vests. Assuming ideal circumstances, appellant could have completed production of the first increment by May 10, 1973, thereby requiring completion of delivery the same date. In the absence of any testimony concerning carrier delivery schedules or method of delivery that would allow appellant to meet the May 10, 1973, FOB destination delivery schedule under such circumstances, we conclude that to do so would not have been possible." Plaintiff cannot logically say on appeal that this finding is not supported by substantial evidence. Since a review of the record reveals that there is no other evidence contradicting the facts on which

the Board based its conclusion, it is deemed final and binding on this court.

11. The Board's finding was as follows:

At the hearing, there was a full discussion of whether the D4–7 strap could be fastened over the pistol, if the strap was made and assembled to the vest in strict accordance with the contract drawings and specifications. On this point, we have found that a conforming strap in a completed vest placed in evidence by appellant could be fastened over a pistol gage, also placed in evidence by appellant, without unreasonable effort. In the absence of any convincing evidence of impossibility, we conclude that the drawings and specifications were not deficient in respect of the D4–7 strap. Accordingly, when appellant stopped work on 3 May 1973, the resulting delay was not excusable. Bd. Dec. p. 12.

This finding is apparently based on the testimony of two witnesses at the hearing who were able to close the D4–7 strap without undue difficulty. The author of this opinion was also able to close the D4–7 strap over the pistol gage on plaintiff's exhibit A–13 with no noticeable difficulty. While the fit was snug, it is undisputed that the Government desired a tight fit.

12. Plaintiff does not appear to dispute this.

Therefore, under the above described conditions, plaintiff's suspension of holster assembly production between May 3, 1973, and May 8, 1973 can be attributed only to its voluntary relinquishment of its right to proceed rather than to the dictates of some amorphous legal duty beyond its control.

As a result, plaintiff has failed to meet ¶ 11(c)'s test for excusability, and is therefore not entitled as a matter of law, to a termination for convenience under ¶ 11(e).

## CONCLUSION

Plaintiff's lament that it suspended end-item production solely in an effort to save the Government from having to accept and pay the contract price for allegedly defective goods may indicate a noble motivation. Yet, there can be no doubt that such a voluntary and unilateral decision to suspend end-item production will not, as a matter of law, constitute a cause beyond plaintiff's control and without its fault or negligence. Accordingly, plaintiff is not entitled to a conversion of the default termination to a termination for convenience, and its petition must be dismissed.

NICHOLS, Judge, dissenting:

Respectfully, I dissent. Since *Schlesinger v. United States*, 390 F.2d 702, 182 Ct.Cl. 571 (1968), there has been no doubt that a default termination under the relevant standard clauses in government contracts is not automatic. It is discretionary. Where the default is technical only, it can be an abuse of discretion to terminate. The result in a case of such abuse is that under the usual clauses the termination becomes one for convenience. That is the proper result here.

The immediate occasion for the default arose on May 3, 1973. The plaintiff was performing a contract to manufacture "survival vests" for paratroopers. He had previously filled orders for this item with success, but this time there was a minor variation in the specifications. The vest included a holster for a small hand gun. Plaintiff, having carried his production to the point near 90 percent of completion, found, or

thought he found, that the new specification called for a defective vest, in that it was impossible to close the holster strap over the gun. He suspended production, notifying defendant he had done so, and of the nature of the defect. Defendant sent a "quality assurance specialist" to the plant on May 7, at the same time stating the visit was not to be construed as a waiver of the delivery schedule. Defendant alleges it notified plaintiff on May 8 that the specification was all right, but plaintiff denied receiving the notice and no finding was made as to who told the truth. On May 10, an increment of vests was due and not delivered. The next day, May 11, defendant sent the notice of default termination, misdirecting it to Boston where plaintiff had no plant or office. It was received May 18. This embarrassing gaffe by defendant increased the loss to plaintiff, as it continued production except for the holster strap until May 18, but does not otherwise affect the case.

The haste to terminate the plaintiff for default appears to me indecent in the circumstances. As even the trial judge admits, the default could have been waived "if excusable." He looks to the contract to find what is excusable, and defines it as something outside the control of the contractor, by analogy to the clause applicable in case of assessment of reprocurement costs. This was not outside the control of the contractor because, heedless of the possible consequences, he could have gone on manufacturing what he believed in good faith to be a defective product.

It is not my intention to challenge the Board finding that the specifications were not defective. That finding has evidentiary support and binds us in my view. We now have before us an exhibit, a sample of the vest. The strap can now be closed easily, though I have no evidence how many Board and court personnel have closed it previous to me, nor how much stretch such handling may have imparted. It is of record that the Board member who heard the testimony had difficulty with it. It is not even intimated that plaintiff's belief was wholly

without foundation, still less that it was mere pretext to cover something else. Nobody wants to be in the position of supplying a defective product, especially when it is to be used by soldiers in combat. The military were not in any great rush to obtain delivery: if they had been, they would have waived the technical default and got their vests in a week. It is significant there are no reprocurement costs in the case: the Board finds there was no repurchase. It is simply a case of using a technical default to eliminate paying for a product no longer needed.

In *Schlesinger*, the delivery time was not met and the pertinent contract clauses were the same as here. The court did not apply them in the wooden way it does here. Mr. Schlesinger had some things going for him that tended to gain him the court's sympathy. He had been a victim of Congressional pressure; legislators, as they sometimes do, had concluded he was a public enemy and should be allowed no rights. Plaintiff here does not benefit from that kind of backlash. Essentially, though, he was in "technical default" just as Schlesinger was. He had a right to have the defendant's officials exercise their discretion, just as with Schlesinger. Here, as in *Schlesinger*, there is no evidence defendant's officials ever exercised their discretion or realized they had any. Since plaintiff stopped production of his own decision, he had no legal right to relief from the default, but he did, if you like, have a right to an informed and deliberate exercise of discretion. The speed of action here reflects a plain intent to effect the default before plaintiff knew it was imminent and before he could urge anything in his own behalf.

I would hold the termination converted into one for convenience, and remand to the Board for determination of quantum.