975 F.2d 870
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
CHAPARRAL INDUSTRIES, INCORPORATED, Appellant,
v.
Donald B. RICE, Secretary of the Air Force, Appellee.
 No. 91-1382.
 United States Court of Appeals, Federal Circuit.
 July 27, 1992.
 
 Before ARCHER, MAYER and MICHEL, Circuit Judges.
 MICHEL, Circuit Judge.
 
 DECISION
 
 1
 Chaparral Industries, Inc. appeals the decision of the Armed Services Board of Contract Appeals (Board) denying Chaparral an equitable adjustment to the price of its contract to build missile containers based on allegedly defective government specifications. Chaparral Indus., Inc., ASBCA No. 34396, 91-2 BCA p 23,813 (1991). The Board held that (1) the government did not breach its implied warranty of its specifications, and (2) the follow-on test agreement did not constitute an admission of legal liability on the part of the government for problems in contract performance. Id. at 119,248. Because Chaparral has not shown that the Board's findings are unsupported by substantial evidence and because the Board correctly interpreted the test agreement, we affirm.
 
 DISCUSSION
 
 2
 I. Implied warranty of specifications.
 
 
 3
 Chaparral relies on Spearin v. United States, 248 U.S. 132 (1918) to support its assertion that the government breached its implied warranty of the specifications. As Chaparral argues, that case, broadly read, stands for the proposition that if a contractor complies with government specifications, an acceptable product will follow. Id. at 137. Relief to the contractor in Spearin, however, was premised on the government specifications being defective. Id. at 136. Indeed, the Supreme Court expressly distinguished those cases in which the government specifications were not defective but where the contractor merely encountered unforeseen difficulties. Id. (citing Day v. United States, 245 U.S. 159 (1917); Phoenix Bridge Co. v. United States, 211 U.S. 188 (1908)).
 
 
 4
 In the instant case, an acceptable final product was obtained when the foam cushions were manufactured according to the government specified dimensions as properly construed, i.e., the foam cushions fit into the metal missile containers. Thus, the government specifications could not have been inherently defective.
 
 
 5
 Although Chaparral encountered difficulties when it cut the specified foam to the specified dimensions at remote locations and then shipped the cut foam pieces to another location for assembly, it does not follow that the specifications were defective. The contract did not require that the foam as initially cut meet certain dimensions or that the foam be manufactured or assembled at a certain location. The contract merely required that cut cushions made of the specified foam meet the dimensions set forth in the specifications. Under ordinary contract construction, that necessarily means at the time and place of acceptance. Chaparral chose Denver, Colorado, to be the place of acceptance, and therefore, was obligated to meet the dimensional requirements at that location.
 
 
 6
 Likewise, the contract did not specify the method the contractor should use to cut the foam, the temperature or humidity at which the foam should be cut, the amount of time the contractor should allow the foam to stabilize after being cut, or the time and manner of shipment. Because these methods of performance were not delineated in the specifications, the government's implied warranty of its specifications did not cover these aspects of performance. Instead, these aspects of performance, as well as that pertaining to the place of cutting the foam, were the sole responsibility of the contractor in producing cushions that met the required dimensional tolerances at the place of acceptance. That Chaparral incurred additional costs in meeting the specified dimensional tolerances because of its selected manner and place of performance does not mean the government's specifications were inherently defective and therefore the government breached an implied warranty of its specifications.
 
 
 7
 Chaparral argues that it could not have directed its subcontractors to cut the foam below dimensional tolerances because the contract permitted the Air Force to perform inspections at the subcontractors' places of business to insure that the subcontractors were manufacturing in strict accordance with the contract drawings and specifications. This argument is not persuasive. Chaparral admitted during oral argument that the government could also inspect at Denver. Given the government's suspicion, and later conclusion, that the change in altitude caused some of the foam to expand in transport from the subcontractors' places of business near sea-level in North Carolina and Massachusetts to mile-high Denver, the government could not have insisted on dimensional accuracy at the subcontractors' places of business.[1] As Denver was the place of acceptance, that was the only location at which the government could insist on the specified dimensional accuracy.
 
 
 8
 Chaparral also argues that the government's choice of foam, not its own selected method of performance, is what caused the dimensional defects. However, the fact that the first article testing was successful and that Chaparral did not encounter any such defects with the larger percentage of the cushions supports the finding that the specifications were not inherently defective. The material selected by the government, expanded polyethylene 2 pound density per PPP-C-1752, Type 1, Class 2, could produce acceptable products, and indeed, did produce adequate products most of the time.
 
 
 9
 Chaparral argues that the government cannot rely on the satisfactory result of the first article testing and that Chaparral did not encounter difficulties with some of the cushions because the government specifications could still "be deemed defective for purposes of the author's liability to the user." Chaparral relied upon and quoted from R.E.D.M. Corp. v. United States, 428 F.2d 1304, 1308 (Ct.Cl.1970). That case, however, is clearly distinguishable from the instant case. In R.E.D.M., most, if not all, of the assemblies were manufactured within government specified tolerances. Twenty percent of the assemblies were unacceptable nonetheless. On that basis, the court found that the specification was defective. Id. In contrast, Chaparral did not encounter any rejections with the cushions which satisfied the government specified tolerances at Denver; only those cushions which were outside the government specified tolerances caused Chaparral problems. Accordingly, here there is no factual basis to infer that the specifications were defective.
 
 
 10
 Chaparral's argument that the government's selection of material caused its problems might be more persuasive if, for example, the material specified by the government could not withstand the loads to which it would be subjected, see J.D. Hedin Constr. Co., Inc. v. United States, 347 F.2d 235 (Ct.Cl.1965) (concrete piles that the government required to be thin-shelled were inadequate because they could not be properly driven), or if the material specified by the government caused adverse health reactions in the contractor's employees, see Greenbrier Indus. Inc., ASBCA No. 22121, 81-1 BCA p 14,982 (1982). In those cases, the contractors' problems were due to inherent defects in the materials for their intended purposes, and the government's selection of material can be properly said to be "the root cause of the [contractor's] production problems." See id. at 74,135.
 
 Here, the Board concluded that the
 
 11
 Government's implied warranty of the specifications does not warrant permitted but unspecified methods of performance, such as [Chaparral's] decision to manufacturer [sic] the cushions at Hibco and Rogers.
 
 
 12
 Chaparral, 91-2 BCA p 23,813 at 119,248. Because Chaparral has failed to show that, to the extent this is a finding, it is not supported by substantial evidence or that, to the extent it is a conclusion of law, it is erroneous, it must be sustained. Moreover, to hold otherwise would impose an onerous and new burden upon the government. Chaparral has not persuaded us that as a matter of policy, the government should be deemed to impliedly warrant in each of its contract specifications that it has informed the contractor of every performance-related characteristic of the materials it specifies, even if it is unaware of those performance characteristics.
 
 
 13
 II. Test agreement.
 
 
 14
 Chaparral argues the government breached the January 16, 1986 test agreement by refusing to enter into negotiations as to quantum after learning of the test results. Chaparral maintains that the meaning of the test agreement is ambiguous, and therefore, the court must look to the conduct of the parties to interpret the agreement. Chaparral contends that "[t]he Air Force's conduct throughout the dispute evidenced its belief that the Government was responsibile for Chaparral's additional costs if altitude caused the foam dunnage to expand." We need not decide about the Air Force's beliefs about liability, because we conclude that, as properly construed, the test agreement was not breached.
 
 
 15
 We are called upon to interpret the meaning of the following phrase in the test agreement: "the results [of the test] will be used in the resolution of subject claim." Because interpretation of a contract is a question of law, a reviewing court reviews de novo the Board's determination. B.D. Click Co., Inc. v. United States, 614 F.2d 748, 752 (Ct.Cl.1980). Here, the Board determined that "This promise to use the test results in the 'resolution' of the claim fell far short of an admission of legal liability contingent on those results." Chaparral, 91-2 BCA p 23,813 at 119,248. Where an agreement is unambiguous, the court does not need to consider extrinsic evidence to determine its meaning. Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed.Cir.1988).
 
 
 16
 We conclude that the agreement is not ambiguous, and therefore, in interpreting the agreement we need not consider the Air Force's conduct. Clearly, the phrase in question is not an admission of legal liability on the claim. Although "use" is a broad term, it cannot be stretched so far as to cover an admission of legal liability.
 
 
 17
 A review of the contracting officer's final decision reveals that the contracting officer (CO) did, indeed, "use" the results of the test in the resolution of subject claim. In particular, the CO considered the results of the Wyle test in assessing both the probability of growth and the amount of growth attributable to expansion of the foam when moved to higher altitudes, and then ultimately in determining liability on the claim. The government's obligation under the test agreement, as properly construed, required no more. Therefore, the government cannot be said to have breached its obligation under the test agreement.
 
 
 18
 Chaparral argues that it is implausible that Chaparral would have entered into such a one-sided test agreement, i.e., one where Chaparral would agree to drop its claim if the results were below a certain number, whereas the government would only agree to enter into negotiations if the results were above that number. It is not clear that, under the circumstances here, such agreement would defy logic. However, the court cannot ignore the plain words of the agreement. And absent some equitable basis for relief, the court is without authority to reform Chaparral's bargain, even if ill-advised. See American Air Filter Co. Inc., ASBCA No. 14794, 72-1 BCA p 9219 at 42,777 (1971).
 
 
 19
 Accordingly, Chaparral cannot rely on the test agreement as a basis for relief.
 
 
 
 [1]
 Neither party disputes the Board's finding that at the time of contracting the government had no superior knowledge of the effect of the increase in altitude on the cushion dimensions. Chaparral, 91-2 BCA p 23,813 at 119,248. The government became aware of the problem only because of Chaparral's performance problems