ORDNANCE RESEARCH, INC.

v.

The UNITED STATES.

No. 161–77.

United States Court of Claims.

Oct. 17, 1979.

Thomas C. Wheeler, Washington, D. C., attorney of record for plaintiff. David V. Anthony and Pettit & Martin, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, BENNETT, and SMITH, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This Wunderlich review case is before the court on the parties' exceptions to the decision of Trial Judge Wood, filed July 27, 1978.

Plaintiff, Ordnance Research, Inc., (ORI) claims recovery for increased costs resulting from what it termed the government's defective specifications under a Navy contract for production of MK 273 Mod O igniters used in fire bombs. Six explosions occurred during production and resulted in delay and increased costs for ORI, not to mention a loss of life. The decision of the Armed Services Board of Contract Appeals (ASBCA), which was limited to the issue of liability, denied the claim. ASBCA No. 17167, 76–1 BCA ¶ 11,740. The trial judge's opinion and recommended conclusion of law held that the board's decision was arbitrary, capricious and not supported by substantial evidence, and that therefore it was not entitled to finality. The trial judge found that plaintiff's failure to heed advisory specifications suggesting a particular process for blending the materials ("wet blending") was not shown to have been causally related to the explosions plaintiff encountered in production, and that the board was incorrect in denying ORI's claim for breach of warranty claim because it used a different blending process ("dry blending").

The trial judge also denied plaintiff's motion for summary judgment on the ground that the board did not make sufficient findings to support plaintiff's entitlement to recovery. He agreed with the board that defendant's specifications were a warranty of satisfactory production of the igniter. But he determined that because the board erroneously found that plaintiff's failure to utilize the "wet blend" process barred its recovery, the board "did not really focus on and find all the facts, nor resolve all the questions of law essential to a determination whether, as plaintiff contended (and contends), Type II compound containing atomized magnesium was commercially impracticable for use in mass production under defendant's contract specifications. * * * Further, the Board did not really find the cause or causes of the last five explosions at plaintiff's plant. * * * [And the] record is not so clear that only one conclusion can fairly be drawn therefrom in this respect." Therefore, the trial judge held that the case should be remanded to the board for further fact findings on the issue of whether the specifications furnished by the government were defective.

Both parties except to the trial judge's opinion. Plaintiff excepts only to the portion of the opinion which requires a remand to the board.

Upon consideration of the briefs and oral arguments of counsel, we agree with Trial Judge Wood that the determination of the ASBCA is not entitled to finality due to its lack of support by substantial evidence. However, we sustain the exceptions to his conclusion that the case must be remanded to the board on the liability issue. We find that all the evidence supports plaintiff's recovery for whatever damages it sustained as a result of the second through fifth

explosions, and there is no opposing evidence that raises a substantial issue of fact. Plaintiff cannot recover for losses due to the first and sixth explosions.

Defendant emphasizes that the scope of our review of board decisions is limited, and we agree that this is so. However, defendant's suggestion that we are able to make additional findings of fact only if the evidence upon which we rely is *uncontrovertible* would restrict our review to an unreasonable degree.* Defendant relies on *Sternberger v. United States*, 401 F.2d 1012, 185 Ct.Cl. 528 (1968), for this standard of review. In *Sternberger* the board refused to rely on plaintiff's proffered evidence as to the quantum of damages due. Plaintiff insisted that this was error, as the government presented no witnesses and thus plaintiff's evidence was *uncontroverted*. It was, however, self-serving, conflicting, and, much of it, opinion not founded on fact. This court recognized that if the evidence is not compelling or substantial, the board need not accept it, even if it was not contradicted by government witnesses. Our case differs. As we discuss below, we have before us persuasive and substantial evidence to support plaintiff's claim.

Other precedents in this court allow us to make findings of fact when we call the evidence *uncontroverted* or *undisputed*. *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1398, 208 Ct.Cl. 639, 651 (1976), *Koppers Co. v. United States*, 405 F.2d 554, 559, 186 Ct.Cl. 142, 150 (1968). *S.S. Mullen, Inc. v. United States*, 389 F.2d 390, 182 Ct.Cl. 1 (1968). The evidence in those cases was not of a nature to raise doubts about its reliability even though not contradicted, and we may assume arguendo that such doubts would have posed a question in the court's mind as to the propriety of basing court findings on it as uncontradicted. Without overemphasizing the turns of phrase used in these past precedents we still must reject an "uncontrovertible evidence test" as a general standard. It would

prevent the court from making any findings of fact from an administrative record, except where a contrary finding was beyond the realm of possibility in light of possible but not actual testimony. Such fact finding would be eliminated in all but rare cases, and the "empty rituals" of remands in instances where no further evidence is likely to exist would increase. *See Maxwell Dynamometer Co. v. United States*, 386 F.2d 855, 181 Ct.Cl. 607 (1967).

■■■ Therefore, we will rely on the standard of review set forth in *Koppers Co. v. United States, supra:*

> In limited circumstances the court will decide an issue of fact contrary to the finding made by the Board. Generally, we do not consider making such findings unless we first conclude that there is no substantial evidence to support the Board's findings. If an administrative board has failed to make a relevant finding of fact and the evidence relating to this fact questioned is *undisputed*, we may make a *supplementary* finding without returning the case to the board. Analogously, where the evidence is *disputed* but the overwhelming weight of the evidence strongly points to one conclusion of fact, we may make a necessary *contrary* finding without returning the case to the board, to obviate what would otherwise become "an empty ritual [which] has no place in a rational decision-making process". (*Maxwell Dynamometer Co. v. United States, supra*, 386 F.2d at 870, 181 Ct.Cl. at 631.) Where, however, as in the case before us, after having heard oral argument, we remain unsure of the exact findings made and the legal standard used by the Board (and the evidence is not so overwhelming as to justify our making our own finding) * * [we are left] no option other than to remand the case to the Board for clarification. [405 F.2d at 559, 186 Ct.Cl. at 150.]

---

* This is not a dead end issue, though the law is materially altered in cases under the Contract Disputes Act of 1978, Pub.L. No. 95–563, 92 Stat. 2383. The court can in such cases take evidence itself in lieu of remanding to boards, at its discretion. The issues here discussed may still be involved if we desire to decide without new evidence on the board record only.

The present case is not like *Gulf & Western Precision Engineering Co. v. United States*, 203 Ct.Cl. 732 (1974). In *Gulf & Western*, plaintiff had attempted to introduce new exhibits into the record, but the board refused to reopen the case and reconsider the claim. This court held the action of the board "arbitrary and capricious" and remanded, because it "[did] not consider that Wunderlich Act standards permit us to make a final determination as to entitlement on the basis of evidence the board refused to receive into the record, or on the fact findings in another case." 203 Ct.Cl. at 736.

The present situation differs markedly. In a letter of August 29, 1975, Administrative Judge Radosh offered to consider requests for reopening the hearing, due to the departure of Colonel Bethany (who had presided at hearing) or "for any other reason." The invitation was declined. Defendant previously had decided not to investigate by its own officers what caused the explosions at ORI. In the circumstances we conclude, as plaintiff urges, that it is unlikely that new evidence can be obtained at this late date.

This case is similar to *Maxwell Dynamometer, supra*. There, due to an erroneous interpretation of the legal standard of proof, the board failed to make a finding of fact as to whether the contract at issue was impossible to perform. That issue became important when this court corrected the legal error. But the court itself made a finding on the impossibility question, as it found that the board could have made only one finding of fact with respect to the matter in question. 386 F.2d at 870–71, 181 Ct.Cl. at 632–33.

This is the situation before us today. We therefore adopt the trial judge's opinion in part, but substitute our own Section IV to comport with our decision that a remand to the board on the issue of liability is not required. Only that section is not in his words.

Trial Judge Wood's opinion, as modified, is printed below.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge: In this action, before the court for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), plaintiff contends that a decision of the Armed Services Board of Contract Appeals[1] ("the Board") denying plaintiff's claim for an equitable adjustment representing increased costs incurred in consequence of defective government contract specifications is factually and legally erroneous, and should therefore be reversed.

The contract in suit called for the production of MK 273 Mod O igniters, described below. During contract performance plaintiff experienced six separate explosions. Each of the explosions occurred in a press room, or "bay", enclosed by reinforced concrete walls and a steel door, in plaintiff's press building. At the times of the first four explosions, the "bay" contained an automatic pelleting machine[2] which, in the Board's words, "rapidly compressed a potent mix of three powders [known as Type II compound] into little pellets." Each of the six explosions occurred during the pressing (or pelleting) operations.

Plaintiff contended administratively, and contends, (1) that defendant's specifications calling for "atomized magnesium" as one of the components of the Type II compound to be pressed (or pelleted) were defective, in that the Type II compound, when containing such "atomized magnesium", could not safely be used in mass production under the contract specifications, and that defendant thereby breached its implied warranty that the contract could be performed using mass production techniques known in the industry, and (2) that defendant's invitation for bids, in which the end items to be produced

1. ASBCA No. 17167, 76–1 BCA ¶ 11,740. Although evidence on quantum was presented administratively, it was there agreed that the Board's decision would be limited to liability.

2. Plaintiff employed a Stokes multi-station press at the outset; use of that press was, however, discontinued after the fourth explosion, in favor of a single-station press.

were designated a "Class C" (minimum hazard) explosive, misled it into the erroneous belief that the end items could be produced without fear of any unusual explosion risk.

In broad terms, the Board concluded that there was no breach of warranty of the adequacy of the specifications, and that plaintiff was not misled by the "Class C" end item designation. The bases for these conclusions will subsequently appear. In defendant's view, the Board's decision is supported by substantial evidence, is correct as a matter of law, is not arbitrary or capricious, and must be accorded finality.

I

By an advertised Solicitation for Bids (No. N00104–70–B–1991) dated May 5, 1970, as amended, the Navy Ships Parts Control Center, Mechanicsburg, Pennsylvania, solicited bids for the production of 53,340 MK 273 Mod O igniters, with half of that amount a "Unilateral Set-Aside for Small Business Concerns".[3] The Solicitation contemplated a fixed-price contract, and contained what the Board termed "a relatively short delivery schedule * * *."

As originally issued, the Solicitation contained, among other things, "Section C—Preservation, Packaging and Packing". Within Section C appeared the heading "Transportation Data", and, under that heading there were a number of subheadings: "Freight Description"; "UFC Number"; "NMFC Number"; "DOT Explosive Class"; "Dangerous Article Reference"; "Type Label"; "DOT Container Marking"; "DOT Vehicle Placarding"; and "DOT Special Permit Number". As originally issued, the Solicitation contained this entry: "DOT Explosive Class: B". By amendment 0001, effective May 12, 1970, however, that entry was changed to "DOT Explosive Class: C", and certain other "Transportation Data" entries were also changed.[4]

On July 1, 1970, defendant awarded to plaintiff a contract (No. N00104–70–C–A166) for the production of MK 273 Mod O igniters. As modified by Amendment P00002, effective July 17, 1970 (awarding plaintiff the small business set-aside portion of the Solicitation), the said contract called for the production of 53,340 igniters, at a total contract price of $1,010,259.60. The contract contained the customary "Changes" and "Disputes" clauses.

The MK 273 Mod O igniter, used in fire bombs, consists of an aluminum casing assembly with a standard fuze well, and is filled with an ignition compound. The contract specifications here in question, furnished by defendant, provided that the ignition compound would consist of 189 pellets (known as Type II compound) in a matrix of powder (known as Type I compound). The components of these compounds, and their respective proportions, appear below.

As modified by Amendment P00002, the contract called for the delivery of first articles by September 28, 1970, and delivery of production quantities within a specified number of days after first article approval, as follows:

| Quantity | Time of Delivery |
|---|---|
| 13,340 | 60 days |
| 20,000 | 90 days |
| 20,000 | 120 days |

The igniters were to be produced in accordance with Purchase Description WS 6514A, "Ignition Compound", dated March 10, 1967. Purchase Description WS 6514A provided (among other things) that the mixing procedures of OD 30752, "Instructions for Blending Ignition Compound and Loading and Assembly of Igniter, Bomb, Mark 273 Mod O", "are advisory for the mixing of the ignition compounds." The mixing, or blending, of the ingredients making up an ignition compound, and the pressing, or pel-

---

**3.** Unless otherwise indicated, the facts stated herein were found by the Board or are properly derived from uncontroverted evidence. See *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1398, 208 Ct.Cl. 639, 651 (1976).

**4.** By Amendment P00009, effective June 11, 1971, several "Transportation Data" entries were again changed; among others, "DOT Explosive Class: B" was substituted for "DOT Explosive Class: C".

leting, of the compound are critical to pyrotechnic manufacture.

WS 6514A provided in part that:

3.3 *Composition and physical characteristics.*

3.3.1 *Type I.* The type I compound shall be a completely blended mixture of ingredients as specified in Table I and shall conform to composition by analysis as specified therein.

3.3.2 *Type II.* The Type II compound shall consist of the ingredients shown in Table II and shall conform to composition by analysis as specified therein. The physical characteristics shall be as specified in Table III.

Table I identified the components of the Type I compound as magnesium (22 + 8 microns) to a percentage by weight by ingredient of 60 + 3, and polytetrafluoroethylene (teflon 5B or equivalent) to a percentage by weight by ingredient of 40 + 3. The 22 + 8 micron magnesium specified in Table I (and in Table II, below, as well) is called fine particle magnesium or "atomized magnesium".[5]

The components of the Type II compound, as specified in Table II, and their respective percentages by weight by ingredient, are as follows:

| Ingredient | Percentage Weight by Ingredient | Abbreviation Assigned by the Board |
|---|---|---|
| Magnesium 22 + 8 microns | 23.2 + 2 | Mg 22 or "atomized Mg" |
| Magnesium 200 + 25 microns | 32.6 + 2 | Mg 200 |
| Polytetrafluoroethylene (Teflon 5B or equivalent) | 37.2 + 2 | T5B |
| Perchloropentacyclodecane (Dechlorane or equivalent) | 7.0 + 1 | Dechlorane |
| | 100 percent | |

To perform its contract with defendant, plaintiff had to blend the components of both the Type I and the Type II compounds

in the proportions specified in the contract specifications, and it also had to press the blended Type II compound into pellets.[6]

OD 30752, referenced in Purchase Description WS 6514A, contained advisory mixing and pressing instructions for Type II ignition compound, as follows:

2. Blending: Based on 9,000 gram blend.

a. Weigh ingredients into separate grounded containers for transportation to the mixing station.

b. Add approximately two gallons of alcohol to the mixer (Sheer-Flo model number 1RL or equivalent).

c. Start mixer and slowly add the teflon powder remotely, being sure that the mixing speed is sufficient to prevent the teflon from settling to the bottom of the bowl. When all the teflon has been added, run the mixer for ten minutes to assure complete dispersion of teflon particles and shut off mixer.

d. Remotely add the magnesium to the mixer.

e. Remotely add approximately one additional gallon of alcohol to the mixer washing any magnesium or teflon from the side of the mixer. Start mixer from a remote position and operate for fifteen minutes.

f. Vacuum filter the alcohol from the blend.

g. Pour the blend into grounded non-sparking metal trays in approximately one-half inch thick layers and dry in an oven or drying building at 110° F + 10° − 0° for 24 hours minimum.

h. Screen the perchloropentacyclodecane through a −40 + 200 mesh and to the nearest gram, weigh the required percentage.

i. Blend into the cooled composition by remotely tumbling (dry) for twenty minutes.

---

**5.** While other size particles may also be termed "atomized", the only "atomized" magnesium here relevant is 22 + 8 microns.

**6.** Plaintiff's president described the pressing operation as similar to that used in making aspirin tablets.

j. Prior to the pressing operation, the heat of reaction of the compound should be checked for conformance with WS 6514.

k. Using a Stokes press, Model DDS–2 or equivalent, press the compound into pellets having the weight and configuration required by WS 6514.

As is apparent, the advisory mixing instructions incorporated what may be described as the "wet" method of blending, in which T5B was added to alcohol and magnesium was then added to the T5B. The mixture was, however, dried before dechlorane was blended into it.

The contract specifications for the MK 273 Mod O igniter were written by defendant, and were based in large part on research and development work done by Atlantic Research Corporation ("ARC") in 1964. The Board found that while ARC (and plaintiff's president, an ARC employee at the time)[7] had "concocted the 'Type II' formula" set forth in Purchase Description WS 6514A, "their creation was solely to meet performance requirements and did not consider the feasibility of production."

In 1968 plaintiff had received a small Navy contract to "establish a production specification" for the MK 273 Mod O igniter, but (except for one paragraph the Board deemed not important to the claim before it)[8] there was no indication in the record that plaintiff "was to, or did, consider the press operation." While both ARC and defendant had previously produced MK 273 Mod O igniters, plaintiff had never done so prior to award of the contract in suit.

Defendant's Naval Ammunition Depot, Crane, Indiana ("NADCrane") had manufactured approximately 900 MK 273 Mod O igniters, although just when is unclear.

ARC had been awarded two contracts, one May 28, 1969, and the other June 25, 1970, to produce a total of 44,374 such igniters. Prior to award of the contract in suit, there had been no other commercial procurements of the MK 273 Mod O igniter. ARC experienced "some fires or explosions * * * related to the production of the * * * igniters," including one explosion prior to the award of plaintiff's contract, and two additional "incidents" prior to the first explosion at plaintiff's plant. Defendant did not inform plaintiff of the ARC "accidents", however, and at the time of bidding on the contract in suit plaintiff was unaware of any ARC fires or explosions related to the igniter.[9]

Both Purchase Description WS 6514A and OD 30752 (containing advisory mixing and blending instructions for Type II ignition compound) contained general safety rules normally observed during the production of any pyrotechnics, and in no way peculiar to either the MK 273 Mod O igniter or to the specified components of the ignition compounds. Defendant did not inform bidders that atomized magnesium might present any unusual hazard, nor did it indicate that atomized magnesium would require any special techniques (other than those prescribed in WS 6514A, OD 30752, and the Department of Defense Contractors' Safety Manual for Ammunition, Explosives, and Related Dangerous Material).[10]

By Amendment P00007, dated November 20, 1970, plaintiff was authorized to commence production, with delivery of initial production units to commence December 31, 1970, and with all deliveries to be completed March 23, 1971. As the Board accurately noted, however, the six explosions that oc-

---

7. Plaintiff's president left ARC in 1966 to form plaintiff. As ARC's research director from 1962–66, he had been in charge of ARC's 1964 work on the MK 273 Mod O igniter.

8. That paragraph of the 1968 contract required plaintiff to "investigate the possibility of achieving partial crush strength by the sintering technique in order to avoid subjecting pelletizing tooling to the high pressures required in pressing to the 14,000 grams crush strength."

9. Plaintiff does not now press the "superior knowledge" argument it made administratively. ARC's experience is, however, relevant in another context.

10. Plaintiff was contractually obligated to comply with the said Safety Manual insofar as it was applicable to work under the contract.

curred during contract performance delayed plaintiff in completing the contract,[11] and final deliveries under the contract were not completed until December 1971.

## II

Although plaintiff had never been involved in a contract to produce MK 273 Mod O igniters, it had performed the small 1968 Navy contract referred to hereinabove. Too, it had successfully manufactured some 104,000 magnesium-zinc-teflon igniter sticks in 1969.[12] In producing these igniter sticks, plaintiff followed the same type of safety procedures initially used in performing the contract in suit, and it experienced no fires or explosions. Plaintiff's president (and project manager for the contract in suit) had had considerable experience with pyrotechnic military contracts, and some such contracts had involved the use of magnesium.

Plaintiff's facilities for performing the contract in suit consisted of three separate buildings: the first was used for blending or mixing the ignition compounds; the second was used for pressing or pelleting the Type II compound; and the third housed the "line operation", where Type I powder and Type II pellets were placed into an aluminum canister to form an igniter. The buildings were specially "furbished" to meet what plaintiff understood to be the requisite safety standards for the production of pyrotechnics, and, on defendant's preaward survey, were determined to be adequate from the standpoint of "safety measures * * * for performance of proposed award."

Conversion of the Type II compound into pellets required automatic pelleting machinery, and OD 30752 recommended the use of a Stokes DDS–2 multi-station press, a standard machine used in the industry and one which had been employed by both defendant and ARC for pelleting the Type II ignition compound. During the pre-award survey, defendant made it plain that contract award was conditioned on the acquisition by plaintiff of a second multi-station Stokes press, and plaintiff subsequently acquired a Stokes DDS–3 press having a somewhat greater capacity than the DDS–2 press.

In the words of Dr. Waite, plaintiff's president,

> [T]he press consists of a turntable in which are fitted punches and the entire table revolves, the travel of the punches with respect to the die is controlled with a cam system, so you put material onto the table surface of the press. The press station moves by. The powder is then filled into the cavities of these dies, and then after that the punches come down from top to bottom to press the pellet and release it from the machine, as a feed machine on the tray part of the machine, it's necessary to have it on the hopper right above the press. * * *

A multi-station press could achieve a rate of production of 220 pellets per minute; a single-station press could achieve a rate of production of 30 pellets per minute.

In furnishing first articles for approval, plaintiff reported to defendant that it had mixed the Type II ignition compound using the advisory wet blending method incorporated in OD 30752. In the Board's words, "it seems that ARC used the wet blend method * * * in producing MK 273 Mod O igniters.[13] In producing a small number of MK 273 Mod O igniters at NAD–Crane, however, defendant had used the dry blending process, without any fires or explosions.

---

**11.** The Board did not determine the exact extent of such delay, but did state that the resulting "unexpected expense to [plaintiff] was considerable." See n.1, *supra*.

**12.** The magnesium used in the igniter sticks was ellipsoidal or granular, not "atomized", and it was mixed with zinc and teflon.

**13.** The record is far from clear, however, that ARC did so throughout its production of such igniters. Indeed, the Board noted that ARC had suffered an explosion while *dry* blending (defined, *infra*) August 21, 1969, but interpreted that allusion to dry blending as referring to a stage in the *wet* blending process. Plaintiff does not now challenge that interpretation, and it is accepted.

Moreover, a formal NAD–Crane project engineering report,[14] dated February 1970, in which "A number of production processes were evaluated to determine the most economical methods of manufacturing the ignition compounds * * * ," recommended dry blending, and that recommendation plainly encompassed both Type I and Type II ignition compounds. Among other things, the 1970 NAD–Crane report (1) indicated that dry blending was more economical than wet blending for high production, since it required a much smaller capital risk investment and saved approximately 4.5 man-minutes per igniter assembly; (2) stated that the safety of the two blending procedures was comparable; (3) concluded that dry blending was satisfactory for production of both Type I and Type II ignition compounds; and (4) reflected that dry blended Type II compound "is more controllable", "exhibited pelleting characteristics superior to those of the wet blended material", and, when pelleted, "increased in crush strength with age * * * ."

The wet blending procedures (as set forth in OD 30752) contained ten steps; the 1970 NAD–Crane report contained 11 wet blending subheadings, but was in substance identical to OD 30752 respecting wet blending. In contrast, the dry blending procedure described in the 1970 NAD–Crane report (in which "the introduction of three components" was "reordered") contained only six steps, with, among other things, a considerable saving of time and labor. Under the caption "production processes", the 1970 NAD–Crane report concluded that "The most economical method of ignition compound production is dry blending. The method is no more hazardous than wet blending." [15]

Although it had wet blended the Type II ignition compound used in producing first articles samples, when plaintiff began production of MK 273 Mod O igniters for delivery to defendant, it "switched to dry blend". Plaintiff did not formally notify defendant that it was employing the dry blending process in production.[16] The Board concluded that plaintiff's dry blending "without notice or permission" was "in violation of the clear terms of the applicable specification" (requiring approval by defendant of any "change of process, production procedures, or methods"), but that the "violation of its obligation to follow the preproduction procedure is not consequential here", and that conclusion is presently unchallenged by either party. Plaintiff experienced no fires or explosions during its dry blending operations.[17]

The Board found that the "wet blending process and the dry are equally safe (and equally hazardous) *as processes* * * *" (emphasis supplied). It also concluded, however, that wet blended Type II compound *pressed* more safely than dry blended Type II compound. Plaintiff vigorously challenges that conclusion, and that challenge will be dealt with in Section III C, *infra.*

---

**14.** The report dealt with the MK 273 Mod 1 igniter, with slightly less atomized magnesium, and slightly more T5B, than the MK 273 Mod O.

**15.** The Board "view[ed] that extract as reflecting on the safety of the mixing process itself without consideration of the consequences of the subsequent press operation." That conclusion is flatly contradicted by the contents of the extract itself, as well as by the 1970 NAD–Crane report as a whole, and is not entitled to finality. Whether the Board's conclusion that the report did not show "whether dry blended type II powder presses *more* safely then wet blended type II powder" (emphasis supplied) is accurate need not be considered, for that conclusion is in any event plainly irrelevant.

**16.** Mr. Driggers, an engineering technician on the MK 273 Mod O igniter, testified, and the Board found, that defendant "was not aware of this switch until [long] after the contract was over." A September 29, 1971 memorandum prepared by Mr. Driggers reflects, however, that some months prior to completion of the contract he was well aware that plaintiff was dry blending. His trial recollection was clearly contrary to fact. The Board's finding of unawareness of "this switch" during contract performance is unsupported by any credible evidence.

**17.** ARC had at least two wet blending accidents of record during its production of the MK 273 Mod O igniter.

As noted at the outset, plaintiff experienced six separate explosions during pressing operations. The first occurred January 18, 1971, and resulted in extensive damage, the major cause of which was blast, and one fatality. Defendant investigated this explosion and concurred in plaintiff's recommendations for action to be taken to provide greater protection to its personnel. With perhaps one exception, the recommendations implemented by plaintiff went beyond those mandated by the DOD Contractors' Safety Manual, but were designed to improve both facilities and operations from the standpoint of safety.

The Board found that Type II ignition compound, in powdered form, was "very prone to combine with available oxygen for rapid combustion", was "very likely to ignite", presented a considerable blast hazard, and was "extremely dangerous in production." The Board also found, however, that the direct cause of the first explosion was plaintiff's negligence in permitting the introduction of insulators into its press room, and plaintiff does not directly challenge that finding. It is accordingly accepted here.

Further explosions occurred March 15, 1971, April 12, 1971, May 3, 1971,[18] August 28, 1971, and October 11, 1971. Plaintiff's investigations into the causes of these explosions reflected no fault. The record does not reflect that defendant made any investigation into or evaluation of the possible causes of these explosions. After the first explosion plaintiff reduced the amount of the blend in the hopper of the press, and implemented a number of recommendations to provide greater protection to its personnel. After each subsequent explosion, plaintiff initiated even more stringent safety measures,[19] but the explosions nonetheless continued to occur. For present purposes, the amount of down time following each explosion is not important.

As noted above, ARC too experienced fires and explosions during its production of the MK 273 Mod 0 igniter.[20] Following a September 24, 1970 fire at ARC, an ARC chemist investigated that incident and, after consulting with Picatinny Arsenal (an Army installation), recommended the artificial "aging" of atomized magnesium. After plaintiff's fifth explosion, Mr. Driggers, a government engineering technician, spoke with an ARC representative, learned that ARC had artificially "aged" atomized magnesium "from a 'shiny silver' aspect to 'a uniform gray' and had eliminated problems,"[21] and "passed the recommendation to * * *" plaintiff. Plaintiff at least attempted to implement that recommendation prior to its sixth, and last, explosion.[22]

In the words of the ARC chemist, ARC's solution was "simply [to] try to pre-oxidize

**18.** Each of the first four explosions was followed by an extension of the contract delivery schedule.

**19.** Among other things, plaintiff further reduced the amount of the blend in the press hopper, began to monitor the temperature of the hopper with a thermocouple, expanded cleanup procedures, and partially tore down and inspected tooling twice daily. After the fourth explosion it discontinued use of a multi-station press, employing instead single-station presses, and after the fifth explosion it installed air-driven blowers in an effort to eliminate any fine particles of atomized magnesium that might have become airborne as a possible causative factor.

**20.** In the Board's words, the fact that atomized magnesium was "hazardous and highly sensitive to ignition" was "confirmed by [an ARC chemist's] statement of 'trouble * * * from the beginning.'"

**21.** A September 1971 memorandum prepared by Mr. Driggers, on whose testimony this finding rests, stated only that ARC said it had exposed atomized magnesium to air "until it turned a darker shade of gray."

**22.** The Board found that plaintiff had artificially "aged" the atomized magnesium "only 2–4 hours as opposed to the recommended 12 hours," and that plaintiff did not artificially "age" "fully as recommended." Those findings are unsupported by substantial evidence. The record fails to show that plaintiff was advised, prior to the sixth explosion, to "age" artificially for 12 hours (or any other specific length of time). While defendant suggests otherwise, the record also fails to show whether plaintiff did (or did not) "age" the atomized magnesium to a darker shade of gray following receipt of the recommendation to do so.

the magnesium or get at least some sort of coating on it, and this was done * * * by simply spreading it out on the floor." ARC artificially "aged" the atomized magnesium *before* it began the wet blending process.[23]   Plaintiff's contract contained neither a requirement nor even a suggestion for artificial aging of atomized magnesium (or a warning against dry blending, a "potential alternate method obvious to" defendant).   Neither plaintiff nor defendant "knew ["aging"] was desirable until so advised by ARC after the fifth explosion [in plaintiff's press room]." [24]

By letter dated September 7, 1971, following the fifth explosion, plaintiff sought an equitable adjustment in contract price on the ground of defective governmental specifications.  The contracting officer denied plaintiff's claim in its entirety by decision dated January 26, 1972.  Plaintiff timely appealed therefrom to the Board, with the result noted at the outset of this opinion.[25]

### III

#### A

At the outset of its argument, plaintiff notes that the author of the administrative decision under review was assigned to the Board following the closing of the administrative record and thus did not preside at or participate in the hearing before the Board in this case,[26] and suggests that the court accordingly "has greater liberty to make its own assessment of the weight and inferences to be drawn from the evidence * * *" than it would have in other circumstances.

While plaintiff accurately states the facts, those facts plainly do not alter the applicable standards of review.  *Tri-Cor, Inc. v. United States*, 458 F.2d 112, 116–17, 198 Ct.Cl. 187, 194–96 (1972), and cases there cited.  In scrutinizing the administrative decision in light of those governing criteria, however, it is not inappropriate to remember that its author "was in no special position to judge credibility * * *." *Morris v. United States*, 171 Ct.Cl. 220, 228 n. 4 (1965); see also *Koppers Co. v. United States*, 405 F.2d 554, 558 n. 7, 186 Ct.Cl. 142, 149 n. 7 (1968); [27] *Sundstrand Turbo v. United States*, 389 F.2d 406, 410, 182 Ct.Cl. 31, 38 (1968);  Rule 147(b).

#### B

Among other things, plaintiff contends that defendant's specifications were defective in "designating the MK 273 Mod 0 igniter as a 'Class C' (minimum hazard) explosive in its Invitation for Bids", and that plaintiff was misled by that designation "into believing that the igniters could be produced without fear of any unusual explosion risk."

The Board concluded the "Class C" designation applied "to end-item igniters for 'Preservation, Packaging, and Packing' with a view to shipment as freight."  The Board found that defendant's choice of "Class C" was, on the limited record before the Board, "arbitrary, i. e. lacking in evident reasoning or factual predicate", but that the testimony of plaintiff's president "that the DOT end-item label 'C' governed his minimum manufacturing safety requirements and his expectations * * *" was neither logical nor reasonable.

**23.** A September 1971 memorandum prepared by Mr. Driggers expressly so indicates, and the ARC chemist also so testified.

**24.** The Board found that "aging" atomized magnesium ("in the sense of the degree of oxidation, not chronological age") "tends to desensitize the hazardous type II blend, making it less susceptible to ignition by pressing", and that finding is not questioned here.  The Board's equation of wet blending with artificial "aging" is, however, vigorously challenged.

**25.** Additional findings and conclusions by the Board will be stated in connection with the arguments of the parties relating thereto.

**26.** The presiding administrative judge herein retired without rendering a decision.

**27.** In reaching the decision under review, the Board was here limited, as the court always is in a Wunderlich Act case, to looking "only at 'cold records.'" *Ibid.*

**474**

The Board's conclusion that a Class C end-item designation, appearing under the heading "Transportation Data", and within a section captioned "Preservation, Packaging, and Packing", did not amount to, and could not reasonably be construed as, a representation that no explosion would occur during the process of *producing* MK 273 Mod O igniters,[28] has been carefully reviewed in light of plaintiff's attacks upon it. That conclusion has not been shown to be in any way arbitrary, capricious, unsupported by substantial evidence, or erroneous as a matter of law.[29] It therefore deserves to be accorded finality here.

## C

Plaintiff's principal contentions are (1) that the Board finding that wet blended Type II compound results in a more "aged" magnesium than dry blended Type II compound and that the wet blending method therefore results in a safer subsequent press operation, is arbitrary, capricious, and unsupported by substantial evidence; and (2) that the Board erred as a matter of law (a) in failing to find that defendant warranted "the mass producibility of the MK 273 Mod O igniters from the designated components thereof, and that the Government breached its warranty since the MK 273 Mod O igniters could not be mass produced under the Government's specifications so long as atomized magnesium was one of the components", and (b) in holding that plaintiff assumed the risk of *all* performance difficulties by dry blending, rather than wet blending, the Type II compound.

In finding that wet blending resulted in "a more 'aged' Mg 22, hence a safer subsequent press operation than the dry blend", the Board relied upon the testimony of Mr. Driggers that "according to experience in the field, the wet blend process tends to

oxidize (or 'age') the material." From this, the Board concluded that plaintiff's "difficulties at the pressing station" were "factually related" to "the blending stage", and that there "is a reasonable expectation that had [plaintiff] wet blended, some or all of the pressing explosions would not have occurred * * *." Understanding of the full significance and effect of these determinations is essential to proper disposition of this case.

To place the matter in proper perspective, it is appropriate to commence with several of the Board's conclusions which are here undisputed: that the contract in suit was a competitive fixed-price contract with a very short delivery schedule; that the MK 273 Mod O igniter was a "production" item designed by the Navy, and that defendant "issued the specification and is responsible for its adequacy and feasibility"; that the parties to the contract contemplated that plaintiff would use mass production techniques in performing it; and under the circumstances there was a "warranted design" and a warranty of the "mass producibility of the detailed design specifications."

The Board also held that had plaintiff followed the "warranted" wet blending "advisory mixing procedure", and had the "wet blended mixture * * * proved persistently unduly hazardous in the press operation there would have been a defective specification." Because of its conclusion that the dry blending method plaintiff actually used in mixing the Type II ignition compound and "its difficulties at the pressing station" were "factually related", however, the Board held that plaintiff's use of the dry blending process, and a resultant failure "to obtain the aging the wet blend process would have provided [were] entirely at its risk", and that there was thus no "defect in the warranted design."[30]

---

**28.** As the Board emphasized, "the end-items did not ignite or explode."

**29.** The contention that defendant also viewed the DOT classification system as applicable to production hazards lacks evidentiary support. Moreover, there is record indication that not even plaintiff did so. On June 2, 1971, plaintiff

advised defendant that "Our costs were based on the Class C basis for shipment and handling. A further classification will increase our cost of performance and result in a claim for additional monies."

**30.** The Board recognized that dry blending, successfully used by NAD–Crane in its produc-

The Board finding that the wet blending process "ages" atomized magnesium and thus results in "a safer subsequent press operation than the dry blend" is the sole foundation for the factual relationship asserted by the Board. The propriety of that determination is thus crucial to consideration of the Board's holding that plaintiff failed to establish a breach of warranty of "mass producibility of the detailed design specifications."

After close and careful consideration of the conflicting contentions of the parties, the evidence of record, and the governing standards, it is concluded that the Board's determination that the wet blending process "ages" atomized magnesium and results in a safer subsequent press operation than the dry blending process is arbitrary, capricious, and unsupported by substantial evidence.

It is important to note first what the Board found Mr. Driggers to have said: that, "according to experience in the field, the wet blend process tends to oxidize (or 'age') the material * * *,"[31] and no more. Mr. Driggers did *not* testify that wet blended Type II powder presses more safely than dry blended Type II powder. That conclusion was the Board's.

Parenthetically, Mr. Driggers' testimony, following a question by the administrative judge, was unresponsive to that question.[32] Moreover, Mr. Driggers was not a chemist, and he obviously was not an expert on magnesium.[33] Indeed, during questioning about a document purportedly containing results of certain Navy "Sensitivity" tests of Gran. 16 magnesium, dechlorane, and a mixture of the two, the administrative judge indicated that Mr. Driggers was not "really technically qualified to explain this document. That is the chemical aspects of it * * *", and the administrative record leaves no doubt that the witness lacked technical qualification in the chemical area.[34]

In this connection, three other matters, each springing from a September 1971 memorandum prepared by Mr. Driggers, deserve brief mention. The first has been noted heretofore: Mr. Driggers' testimony to a lack of knowledge that plaintiff was using the dry blending method during contract performance was plainly contrary to fact. That untruth was, moreover, compounded by the Board's acceptance of it as fact, along with a contradictory finding based on Mr. Driggers' September 1971

tion of the MK 273 Mod O igniter, "was a potential alternate method obvious to * *" both defendant and plaintiff, and that the "contract specifications did not warn against dry blending or warn that 'aging' Mg was required or desirable." It held, however, that the dry blending process was not warranted, and plaintiff does not contend otherwise.

31. The Board cited "as confirming Mr. Driggers' view" a report he had prepared stating that an ARC official (who did not testify) had indicated that dry blending "is probably compounding [plaintiff's] problem." Mr. Driggers admitted, however, that the testimony summarized above was based on what he had been told by that ARC official, not on any personal "experience". In short, his testimony rested only on hearsay, but was deemed confirmed by that same hearsay. While such evidence may be admitted administratively, it must sufficiently convince a reasonable mind to rise to the level of substantial evidence. *Cf. Peters v. United States*, 408 F.2d 719, 723, 187 Ct.Cl. 63,

71 (1969); *Morelli v. United States*, 177 Ct.Cl. 848, 853–54 (1966). With respect to the ARC official's failure to testify, *cf. Rice Barton Corp. v. United States*, 88 F.Supp. 271, 275, 115 Ct.Cl. 575, 593 (1950); *Sherwin v. United States*, 193 Ct.Cl. 962, 984–85, 436 F.2d 992, 1005 (1971).

32. The administrative judge simply asked whether the Type II compound was "dry" during the pressing operation. Mr. Driggers' answer was "That is dry then, and the wetting process, you tend to, according to experience in the field, oxidize the material."

33. He had an A.A. degree from a junior college with a machinist curriculum. Defendant's suggestion of a waiver by plaintiff of the right to question Mr. Driggers' competency is neither supported by citation of authority nor persuasive.

34. Indeed, Mr. Driggers did not know whether or not Gran. 16 was the same type of magnesium used in the MK 273 Mod O igniter.

memorandum, without apparent cognition of the contradiction.[35]

The second is that Mr. Driggers also knew, at least in September 1971, that ARC *first* "reduced the sensitivity [of atomized magnesium] by oxidizing it in their plant by exposing it to air until it turned a darker shade of gray" and *then* "blended it into the ignition compound * * *." In short, he knew (and the record clearly shows) that ARC, the sole source of his "experience in the field" knowledge, oxidized atomized magnesium *before* wet blending it.

The *third* is that when Mr. Driggers recommended artificial "aging" of atomized magnesium to plaintiff, he then knew that plaintiff was dry blending, he also knew that ARC was "aging" the magnesium and *then* wet blending it, and he purportedly knew about what he referred to at the administrative hearing as "experience in the field." In neither his September 1971 memorandum, nor in his testimony, however, did he even claim to have communicated to plaintiff that it *might* usefully adopt "wet blending" to enhance safety. If wet blending alone had the "aging" effect assigned to it by Mr. Driggers and the Board, it is strange that Mr. Driggers did not so advise plaintiff in September 1971.

In light of the foregoing, Mr. Driggers volunteered, hearsay and unresponsive administrative comment that the wet blending process tends to "age" atomized magnesium can scarcely be deemed "substantial evidence", as that term is used in the present context. *See Koppers Co. v. United States, supra,* 405 F.2d at 556–58, 186 Ct.Cl. at 147–49; *Centre Mfg. Co. v. United States,* 392 F.2d 229, 235, 183 Ct.Cl. 115, 125 (1968); *Peters v. United States,* 408 F.2d 719, 724, 187 Ct.Cl. 63, 72 (1969). The conclusion just stated is, moreover, strongly fortified by other factors improperly denigrated, or wholly unmentioned, by the Board.

First, as demonstrated by the manner in which Mr. Driggers' comment entered the administrative record, defendant did not even purport to contend in the administrative hearing that wet blending tended to "age" atomized magnesium and to enhance the safety of the press operation. *Cf. S.S. Mullen, Inc. v. United States,* 389 F.2d 390, 396–97, 182 Ct.Cl. 1, 14–15 (1968). The government brief to the Board did not mention either Mr. Driggers' volunteered comment, nor the government exhibit cited by the Board as "confirming" it. Instead, we read the brief as admitting the record contains no evidence that the wet blending would produce a safer compound for pelletizing. It says that question is "forever undeterminable" though "open to conjecture." [Last two sentences by court.]

Second, Dr. Waite, plaintiff's president, who held a Ph.D. in chemistry, and who admittedly had "considerable experience with pyrotechnic military contracts" (some of which had involved the use of magnesium), testified unqualifiedly that there was no significance between the wet blending and the dry blending method, and that testimony came in response to a question concerning pressing, not blending, operations.

The Board characterized Dr. Waite's testimony as "focused on the safety of the blend process itself, and not the question of desensitizing the Mg for the press operation", and it supported this characterization by record references. In doing so, however, it omitted any reference whatever to the portion of his testimony just described.[36] In short, the Board correctly described a portion of Dr. Waite's testimony, but entirely ignored another portion which *did* focus on the safety of the press operation. This is error.

Third, the Board misstated the testimony of an ARC witness whose credentials were

---

**35.** Specifically, the Board cited a September 1971 memorandum reflecting that Mr. Driggers knew plaintiff was dry blending, while also finding (on the basis of Mr Driggers' testimony) that defendant did not then know plaintiff was dry blending.

**36.** Dr. Waite's qualifications as a chemist were outstanding. That plaintiff continued use of the dry blending process, notwithstanding explosions, confirms that Dr. Waite saw no relationship between the type of blending method used and the safety of the press operation.

"essentially the same" as Dr. Waite's, by stating that the witness "thought wet blending to be the safer method * * *." When asked whether wet blending "make[s] it a safer mix to work with in your opinion", the witness actually testified that *"During the actual blend*, I'd say its probably safer." [37] (Emphasis added.) In light of the basis for the Board decision, the difference between what the witness actually said and what the Board found that he said is particularly significant.

Fourth, the Board construed a February 1970 NAD–Crane report (recommending dry blending as the most economical method of ignition compound production, and stating that the method was no more hazardous than wet blending) "as reflecting on the safety of the mixing process itself without consideration of the consequences of the subsequent press operation." The said recommendation and conclusion appeared in the 1970 NAD–Crane report under the heading "Production Processes", and the report makes it crystal clear that they were reached only after "Production Processes Analysis", including analysis of "blending of ignition compounds" *and* "the pelleting of Type II ignition compound." The Board's conclusion that the report dealt only with "the safety of the mixing process itself" is also erroneous.

Fifth, no government document, either prior to or after plaintiff's contract, indicates or even hints that wet blending "ages", or has a tendency to "age", atom-

ized magnesium. In this connection, it is significant that in a December 28, 1971 solicitation for the MK 273 Mod 1 igniter,[38] defendant included the following:

> CAUTION, MAGNESIUM POWDER OF RECENT MANUFACTURE CAN EXHIBIT INCREASED IMPACT, FRICTION, OR ELECTROSTATIC SENSITIVITY OVER THAT WHICH HAS BEEN IN STORAGE. RECENTLY MANUFACTURED MAGNESIUM POWDER MAY REQUIRE ARTIFICIAL AGING TO DECREASE SENSITIVITY.

In that solicitation, defendant still did not make wet blending mandatory, nor did it recommend adoption of that method of blending as an aid to the artificial "aging" of atomized magnesium.[39]

Sixth, the Board properly found that ARC had had "trouble [with atomized magnesium] * * * from the beginning," [40] but that, in late 1970, ARC "had turned to artificially aging the Mg * * * and had eliminated problems." The Board also found, however, that ARC "used the wet blend method * * *." The validity of the Board's wet blending solution for plaintiff's difficulties is contradicted by the fact that ARC, which did employ the wet blending process, also had to adopt the practice of artificially "aging" its atomized magnesium by exposure to air *prior* to wet blending to solve its own problems with that material.

---

**37.** In light of the precise question asked, the careful answer given strongly corroborates Dr. Waite's view that the blending method employed does not affect the safety of the press operation. It was, moreover, given twice, in substantially identical words.

**38.** In the December 1971 solicitation, substitution of ellipsoidal magnesium for atomized magnesium was allowed. Dr. Waite testified that the change would sharply decrease the sensitivity of the Type II ignition compound and add greatly to safety.

**39.** The Board deemed the December 1971 note "redundant", holding that it simply contained the same advice plaintiff had theretofore been given (after the fifth explosion at its plant), and that it showed defendant's good faith. Even assuming the note to be inadmissible to prove

that the specifications in plaintiff's contract were defective (*cf. Foster Wheeler Corp. v. United States*, 513 F.2d 588, 595–96, 206 Ct.Cl. 533, 547 (1975); Rule 407, Federal Rules of Evidence), it clearly may be taken into account in determining whether the Board's finding that wet blending tends to "age" atomized magnesium and enhance the safety of the press operation is supported by substantial evidence. Moreover, in any subsequent proceedings herein, the Board is free to reach its own conclusions concerning admissibility.

**40.** ARC experienced four "accidents" of record related to production of the MK 273 Mod O igniter, plus "a few fires during press operations and a few in other than press operations, that were not reported to the Navy * * *."

In light of the foregoing, and on the administrative record now before the court, the Board's finding that the wet blending process "results in a more 'aged' Mg 22, hence a safer subsequent press operation than the dry blend" (and other findings dependent thereon)[41] is arbitrary, capricious, and unsupported by substantial evidence. Indeed, on this record, a contrary finding that the blending method employed in mixing the components of the Type II ignition compound is unrelated to the safety of the operation in which the said compound was pressed or pelleted is impelled by the substantial evidence of record.

## IV

Trial Judge Wood thus found that plaintiff's use of the dry blending method did not bar it from pursuing a breach of warranty claim against the government, since such use was not shown to have been related to the dangers encountered in the pressing process. He believed that defendant could be liable on a warranty theory. However, the trial judge went on to hold that the findings of the board and the evidence in its record were insufficient to support determination of liability by the court, and he recommended a remand to the board to fix such liability.

We substitute our Part IV for the one he recommended because we find the remand on the issue of liability unnecessary. There is sufficient evidence in the record to support the conclusion that the explosions occurred because the precautions prescribed by the government specifications and advisories were inadequate to deal with the extremely volatile magnesium compound required for the manufacture of the igniters. And although the accident reports of ORI and the testimony of the company's president, Dr. Hal Waite, which in a large part support our conclusions are self-serving, they are not deprived of credibility on that account. The reports and testimony

are not rebutted by the defendant; indeed, the government failed to conduct any investigation by its own officers after any of the explosions. Instead, it relied on plaintiff's reports and photographs to establish what happened at the plant and what additional safety precautions would be attempted. By leaving the matter thus, defendant stated by its inaction its confidence in Dr. Waite's qualifications and the accuracy of his reports. He was left to tell the story, both at the time of the explosions, and at the time of trial. Having so relied, defendant cannot now reverse its position and say the evidence is self-serving, incomplete, and not "uncontrovertible," or conjure up the possible existence of evidence outside the record and never offered.

The evidence may not be "uncontrovertible," but it is "uncontroverted" as the term is used in our precedents. Plaintiff not only has presented undisputed evidence of the absence of personnel safety or equipment violations on its part, but also has offered substantial and undisputed evidence that allowed the board to find that the Type II compound was very volatile and "prone to combine with available oxygen for rapid combustion." It is also uncontested that the government specifications did not prescribe special safety procedures adequate to deal with this unstable compound. There is now no mystery about the causes of the explosions. Given the light burden of proof imposed on plaintiffs furnished design specifications by the government, we think this evidence is sufficient to warrant a decision that the government was liable for the unexplained explosions as for breach of warranty. The whole record supports plaintiff's assertion that a remand for more evidence and findings on the causes of the explosions would be an exercise in futility.

Four unexplained explosions occurred at ORI's plant between March 15, 1971, and August 28, 1971. These are the second through fifth explosions that occurred; the first and sixth explosions will be discussed

---

**41.** *E. g.*, that had plaintiff wet blended some or all of the explosions during press operations probably would not have occurred, and that while plaintiff "would divorce the blending stage from its difficulties at the pressing station, * * * we found them factually related."

below. The government offers no evidence of any negligence on plaintiff's part that could have contributed to these four explosions. Plaintiff followed all the safety procedures prescribed by the government and more. It took precautions in handling the material that were adequate given the knowledge it possessed about the magnesium at the time. As discussed in Part III above, ORI's use of wet or dry blending was not shown to be related to the difficulties involved in the pressing process, and plaintiff's practice of dry blending will not bar its claim of defective warranty in the absence of any causal connection to the disasters.

No safety violations or equipment deficiencies were found to have caused these four explosions, although plaintiff, understandably concerned, conducted investigations to determine the root of its problems. And after each explosion, it instituted additional safety practices not required by the government in the hope of solving the problem. After the second explosion, however, ORI's officers concluded that the prescribed magnesium compound was especially hazardous in production and probably the source of the difficulty.

This evidence supports a determination that the government is liable for the second through fifth explosions.

The specifications furnished plaintiff by the government were *design* specifications for a mass production of igniters. They described in detail the materials and the manufacturing processes to be used, and required compliance with the Department of Defense Contractors' Safety Manual for Ammunition, Explosives & Related Dangerous Materials.

[7] When the government issues design specifications of a detailed nature, as in this case, it warrants the sufficiency and efficacy of those specifications to produce the desired product in a satisfactory manner. *La Crosse Garment Mfg. Co. v. United States*, 432 F.2d 1377, 193 Ct.Cl. 168 (1970), *J. D. Hedin Construction Co. v. United States*, 347 F.2d 235, 171 Ct.Cl. 70 (1965). The board rightly found that the specifica-

tions were a warranty on the part of the government. If such specifications prove defective or impossible to perform, the government must compensate the contractor for the additional costs of performance. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *J. D. Hedin Construction Co. v. United States, supra.* It is not necessary to spell out that specifications having major safety defects are fully as much in breach of the implied warranty as defects in the feasibility, practicability, or commercial possibility of performance as specified. *Cf. Chris Berg, Inc. v. United States*, 404 F.2d 364, 186 Ct.Cl. 389 (1968).

Defendant contends that even if its design specifications created a warranty it has not been determined that the deficiency in the specifications caused the explosions, and that the liability for the explosions is an issue for the board on remand.

■ We disagree. When design specifications are furnished by the government, evidence that the contractor utilized the particular materials and followed the methods specified is often enough to establish performance impossibility or impracticability for which the government, as creator of the specifications, is responsible. *R.E.D.M. Corporation v. United States*, 428 F.2d 1304, 192 Ct.Cl. 891 (1970) is especially applicable to the present case. There the plaintiff-corporation was unable to "arm" artillery fuzes consistently and the fuze rejection rate was high. R.E.D.M. solved the problem by reducing the thickness of one of the fuze components (the "leaves"). The court found that R.E.D.M. was entitled to recover its additional costs, despite the fact that it could not explain why its change worked. The court based its decision on the following findings of fact:

* * * (1) most, if not all, of the assemblies in question were manufactured within the allowable tolerances, (2) a substantial percentage of the units manufactured within permitted tolerances nonetheless failed to arm properly, and (3) after plaintiff began using thinner leaves, arming failures dropped to well within

the performance requirements of the contract. [428 F.2d at 1308, 192 Ct.Cl. at 898.]

The government attempts to distinguish this case by arguing that in *R.E.D.M.* the end products were faulty whereas here the end products were acceptable but the manufacturing process itself failed. We do not find this distinction tenable. The court in *R.E.D.M.* focused on R.E.D.M.'s burden to show (a) a defect in the warranted design, and (b) that the defect caused the failure of or difficulty with the particular project. R.E.D.M. could not pinpoint the defect or explain why the initial government specifications failed; it could only show that following the original specifications resulted in the failure, and that a change produced results. The court held that that was sufficient. Plaintiff in this case has a similar burden, and like R.E.D.M., it can show that an alteration in the specifications solves the difficulty. Whether the problem was manifested in faulty end products as in *R.E.D.M.*, or in the production process itself, as is this case, it is not important.

Plaintiff has demonstrated that an additional step not originally specified has been used and appears to have solved the production problem. This step is the "artificial aging" process first used by ARC and later by plaintiff. No further explosions occurred after this step was incorporated into manufacturing procedures. Not only did ORI show that a change in specifications solves the difficulties, it gave the board and this court an explanation for why the aging process worked. Aging tends to oxidize the magnesium and make it more stable. The board found that aging desensitized the magnesium compound, making it less susceptible to ignition in the pressing process. Therefore, the record not only contains evidence that no violations were found on the part of the plaintiff, it points to a virtually certain cause of the explosions—the sensitive unaged magnesium. The government has presented no evidence to rebut this.

■ The court finds as facts that, the precautions prescribed in defendant's specifications and advisories were inadequate, the plaintiff's safety precautions equalled or exceeded those specified, the compound as ready for pelletizing was dangerous, and other causes being eliminated, the dangerous nature of the compound caused all explosions after the first. Contrary findings would not have the support of substantial or any evidence.

■ Plaintiff cannot recover for the first and sixth explosions. An investigation after the first explosion revealed safety violations, so ORI cannot recover for damages resulting from that incident. Plaintiff is also unable to recover for the damage resulting from the sixth explosion, because before that explosion, plaintiff had been told by the government that artificial aging had been found to desensitize the magnesium. Plaintiff did age the magnesium, but only for two to four hours. Generally, the record reflects that the material must be aged for 12 hours or more. Plaintiff maintains that the record contains no evidence that the government told them how long to age the material. But even if ORI was not told a specific length of time, this lack of a time frame was a patent omission in the government's new advisory. Having received it, plaintiff was obliged to take note if it was to hold defendant to its warranty of safety. Plaintiff was bound to make further inquiries as to proper procedure before embarking on further production. Advice to age a material is worthless for patent ambiguity if nothing is said whether the time of aging is hours, days, or years. *Cf. George Hyman Construction Co. v. United States*, 564 F.2d 939, 945, 215 Ct.Cl. 70, 81 (1977); *Highway Products Inc. v. United States*, 530 F.2d 911, 920, 208 Ct.Cl. 926, 942 (1976), *Blount Brothers Construction Co. v. United States*, 346 F.2d 962, 972–73, 171 Ct.Cl. 478, 496 (1965) (dictum). Plaintiff also knew that the magnesium had to be aged until it turned dark gray. *See* fn. 24, *supra*. It did not prove it aged the magnesium until this color change occurred. Plaintiff cannot rely on defective specifications while failing to observe an advisory when it was on effective notice that an essential element of the advisory had inad-

vertently been omitted. Such conscientiousness was especially necessary given the fact that plaintiff had experienced four explosions for which no cause had been found.

We therefore hold that ORI may obtain an equitable adjustment for the increased costs incurred as a consequence of defendant's defective contract specifications, and that those defective specifications are responsible for the explosions that occurred on March 15, 1971, April 12, 1971, May 3, 1971, and August 28, 1971. The government is not liable for the damages and increased costs due to the explosions on January 18, 1971, and October 11, 1971 (the first and sixth explosions).

## CONCLUSION

Accordingly, plaintiff's motion for summary judgment is granted in part and denied in part. Defendant's cross-motion for summary judgment is denied. Further proceedings in this court are stayed for six months and we remand the case to the board under our Rule 149(b) to determine the quantum of damages due plaintiff due to breach of warranty. Plaintiff's counsel is instructed to advise the court of the status of proceedings at 90-day intervals, pursuant to Rule 149(f).